# CHARLESTON.

## STATE v. BALLARD PLYMALE.

Submitted November 15, 1921.   Decided November 29, 1921.

HOMICIDE—*Instruction as to Justification of Assault by Deceased Upon Accused Held Error as Not Supported by Evidence.*

In a prosecution for murder, where the accused relies on self defense, and the evidence shows that the deceased was committing an aggravated assault upon him with a dangerous and deadly weapon at the time the fatal shot was fired, it is error to instruct the jury that such assault was justified if they believe from the evidence that the deceased had reason to believe, and did believe, that he was in danger of death or great bodily harm at the hands of the accused, when the evidence does not show, or tend to show, an assault, either real or threatened, upon the deceased by the accused.

89 W. Va.

Error to Circuit Court, Logan County.

Ballard Plymale was convicted of murder in the second degree, and he brings error.

*Reversed and remanded.*

*E. L. Hogsett,* for plaintiff in error.

*E. T. England,* attorney general, and *R. A. Blessing,* assistant attorney general, for the State.

LIVELY, JUDGE:

Defendant Plymale was convicted of murder in the second degree in the circuit court of Logan County and, on the 27th day of October, 1919, was sentenced to confinement in the penitentiary for five years; from which judgment he prosecutes this writ of error.

The defendant was postmaster at Christian in the county of Logan, was 62 years of age and weighed from 135 to 150 pounds. The deceased, Sanford Morgan, owned a small stock of goods at Christian and there were some business transactions between him and Plymale which necessitated the keeping of mutual accounts. On the 1st day of October, 1919, Morgan went to the post office where he was asked by Plymale if he was ready to make settlement and Morgan replied, ''I will settle with you and I will pay you all I owe.'' At that time Gas Blankenship was in the post office with Morgan, but his evidence was not taken upon the trial. As Plymale started to procure his book of accounts so as to compare it with Morgan's book, it appears that Morgan made an assault upon him with his fists and knocked him down and began beating him, assisted by Blankenship. Several persons hearing the noise of the affray came on the scene and attempted to take Morgan off of Plymale and separate them but for a time were prevented from so doing by Blankenship, who was armed with a stick or club and who insisted that no one should interfere until there was a cry of ''enough.'' Finally the men were separated, Plymale having been beaten up considerably, there being wounds on his face and behind his ear which were bleeding, and Morgan was told to go away by a Mr. Blamire, a man who seemed to be in authority

89 W. Va.

in the village, or collection of houses at the lumber plant. Before going, however, he procured Plymale's book of accounts and took the same with him to the grade of the railroad about 155 feet from where the post office was located. Plymale, after regaining his feet, seemed to be incensed at Blankenship and drew a knife and chased him away, and one or two of the witnesses said that he took the stick or club, with which Blankenship had kept back the crowd that desired to separate the combatants, and made some futile efforts to strike Blankenship with the stick. Blamire then pacified Plymale and insisted that he should go and wash away the evidence of the affray. In ten or fifteen minutes after Plymale had washed he discovered that his book of accounts was gone; and presuming it had been carried away by Morgan, who was down on the grade, started in that direction. Three witnesses, Marion Harless, Bill Toller and Ott Cook, were present and saw the difficulty between Morgan and Plymale down on the railroad grade where the fatal shooting occurred, and were all examined as State's witnesses. There is very little discrepancy in their testimony, and it is not materially different from the testimony of the defendant. These witnesses testify that they were near Morgan; that he was sitting on the grade, or near the grade, of the railroad and observed Plymale approaching leisurely and with his right hand in his front trousers' pocket. Upon observing his approach Morgan arose and remarked, "There comes that old man Plymale," and then started to move down the railroad grade and Plymale walked in the same direction but a little behind Morgan. Plymale, in an ordinary tone of voice, asked for the return of his book and Morgan replied, "It is not your book." Some further colloquy occurred between the men about the return of the book, Plymale firmly insisting that it was his book and for Morgan to look inside and see. One of the witnesses says that Morgan picked a club up after he had walked down the grade some feet, having in the meantime picked up a rock which he discarded when he found the club. Neither of the other two witnesses saw him pick up the rock, nor did the defendant himself. It is further in evidence by

two of the witnesses that when Morgan refused to give up the book, he told Plymale to go on away or he would hurt him "a damn sight worse than he had." It appears that all this while Plymale kept his right hand in his trousers' pocket but made no demonstration or any effort whatever which would indicate that he was going to assault Morgan. On the contrary he told Morgan he was not going to touch him, but that he wanted the return of his book. Then it appears that Morgan circled or, as some of the witnesses say, "maneuvered" and got back on a higher piece of ground on the grade and about six or ten feet away from Plymale, who was facing him. At this point, the two men having gone back up the grade, Morgan suddenly sprang at Plymale and struck him over the head with the club. He continued striking him with the club and Plymale was throwing up his left hand to prevent his being hit on the head, and after being struck several times, the witnesses saying from three to six times, with the club Plymale drew his revolver out of his pocket and fired one shot down into the ground, as he, Plymale, says, to scare Morgan. Morgan then caught Plymale's right hand, in which he had the revolver, and shoved his arm up in the air and continued to hit him with the stick or club, which he, Morgan, had in his right hand. Plymale twisted loose from the hold on his wrist and quickly fired two shots through Morgan's breast which caused him to fall on the ground. A short time thereafter he expired. Plymale then turned around and started back up towards the post office and in the direction of his dwelling, but faintness overcame him before he got there and he sank down on the ground and was afterwards assisted to his house by a Mr. L. A. Marsh. He was examined a short time afterwards by Dr. Thornsbury, who found two bruises on the left side of his head, one of which, just over his ear was swollen to the size of a hen's egg; he had a small cut place over his left eye and a bruised place across the left side of his neck and his left arm was bruised along on the bone between the wrist and the elbow. His neck was swollen some, and a cut on his head was about one-half inch long but not very deep; his left leg was bruised and also he had a bruise on his hip.

He was sitting on the bed when the doctor came in but got into his chair and had his wounds dressed. It appears that Plymale was rather slimly built and had not been in robust health for several years; while it appears from Dr. Thornsbury's testimony that Morgan was a strong, symmetrically built man and weighed about 180 pounds. There appears to have been no prior ill feeling between these two men. Plymale testified that he had the revolver in his pocket at the time of the first assault at the post office and that he was in the habit of carrying this revolver because he handled considerable money at the post office and always kept some on hand for the purpose of accommodating workmen in the neighborhood by cashing checks for them. He said that he had no intention of using this revolver when he went out to recover his book and that he had no particular ill feeling towards Morgan and went out solely for the purpose of securing the return of his property; that not only Morgan's account was therein but that it contained his accounts with various other persons. Evidence introduced on the part of the defendant was to the effect, and tended strongly to establish the fact, that Plymale was a good citizen and peaceful and quiet in the neighborhood and was never known to be in a difficulty before. On this evidence and under the instructions of the court the jury returned a verdict of second degree murder.

Error is predicated on the refusal of the court to set aside the verdict and grant a new trial. (1) Because the evidence does not sustain the verdict; (2) because instruction No. 3 given by the State was improper and misleading.

A consideration of the evidence as it appears from this record is very persuasive that it is not sufficient to sustain a verdict of murder in the second degree. However, the jury has the right to pass upon the credibility of the witnesses and to weigh the testimony and it must be a very clear case before a court will interfere on the ground that the evidence is not sufficient. The jury and the trial court have peculiar advantages over an appellate court in such matters, in that they have the witnesses before them and can observe their appearance and their demeanor while giving their testimony.

It may be observed, although the point is not made, that the trial was had soon after the crime, if any, was committed. The fatal shooting occurred on the first of October, and on the 27th of the same month the sentence was pronounced. It may be that the fact that there had been a violent killing in the neighborhood at so recent a date before the trial had a material tendency to create a demand that there should be retribution, that someone should suffer for it. The world wide conception of primitive times which blossomed out in the old Mosaic law that there should be ''an eye for an eye and a tooth for a tooth'' ''and he that killeth any man shall surely be put to death'' has left its imprint on modern civilization and its influence is yet to be reckoned with. There should be calm and deliberate and well considered investigation of all such occurrences. There should be deliberate haste. We feel it unnecessary to say whether or not the evidence is sufficient to support the verdict.

However, we are of the opinion that the instruction complained of is improper under the evidence and circumstances of this case. That instruction is as follows: ''The court instructs the Jury, that if they believe from the evidence, beyond a reasonable doubt, that the prisoner, Ballard Plymale, armed with a deadly weapon, approached the deceased, Sanford Morgan, while he, the said Sanford Morgan, was peaceably standing or sitting on or near some railroad ties or railroad grade, in such a manner as to give the deceased reasonable cause and ground to apprehend a design on the part of the prisoner to do him, the said Sanford Morgan, some great bodily injury, or to kill him, and reasonable cause to believe and apprehend that there was imminent danger of such design being accomplished, and if the jury believe that said Sanford Morgan did then and there have such apprehension and belief, then the deceased had then and there a right to procure a club, or use one he then had upon the prisoner and even to kill the prisoner in order to save his own life or to protect him from great bodily harm at the hands of the prisoner, and if the prisoner under such circumstances kills the deceased, he cannot be acquitted upon the plea of self defense. But of all the facts and circumstances

the jury are to judge from all of the evidence before them."
This instruction is relied upon as having been given and ap-
provided in the case of *State* v. *Hatfield*, 48 W. Va. 561.    In.
approving this instruction in the Hatfield case, the opinion.
says it was justified under the evidence of that case.   While
there is no statement or summary of the facts given in the
Hatfield decision, it is apparent from reading the whole case
that a feud existed between Hatfield and his victim Ellis;
that Hatfield had threatened to kill Ellis at the first oppor-
tunity, which threats had been communicated to Ellis and
both were armed with Winchester rifles.  Hatfield had gone to
take some letters to the postoffice, carrying his rifle with him.;
Ellis was on the steps of a railroad car, either alighting from
the train or entering it, which the opinion does not state;
Hatfield approached him.   "That Hatfield provoked a
quarrel with Ellis for the sole purpose of killing him, if he
could succeed in having him resent his insults, there can be
no question", so states the opinion.   The opinion continues:
"He stood with his gun pointed down with his hand on the
lock and a part of the time at least the gun cocked, and
which could be raised in position to shoot as quick as a flash
of lightning; it was nothing short of a malicious assault on
Ellis, yet defendant's counsel contend that it amounted to
nothing but words.  If Ellis had ever happened in an un-
guarded moment to put his hand toward his pocket he would
have been killed in a second of time, the gun could scarcely
have been in a more threatening position if it had been
pointed at his breast."   As will be seen from the other in-
structions in the Hatfield case the evidence was that Hatfield
not only sought out Ellis to kill him, but began the quarrel
and made a malicious and deadly assault upon his victim by
cocking his rifle and presenting it in immediate readiness
to carry out his design.   Under such evidence and circum-
stances the instruction, taken in connection with the other
instructions, was proper and could not have misled.   It is
clear that under such circumstances Ellis would have been
justified in believing his life was in imminent danger.   His
assailant had declared he would kill him on the first oppor-
tunity.   He approached with threatening words, with a dead-

ly weapon cocked and presented. Here were overt acts, an assault, not abusive insulting words alone. Had Ellis killed his assailant under such facts and circumstances, he would have been justified in killing in order to save his own life; and Hatfield could not take advantage of his own wrong and escape under the plea of self defense, unless he had first declined the combat and retreated to the wall, and then the fatal shot must have been fired in order to preserve his own life or protect himself from great bodily harm. Here there are no such circumstances from the case made out by the State's witnesses, or from any witness.

Morgan began the assault at the post office, and, after severely whipping Plymale, went into the office and took away the account book, the property of Plymale, containing evidence of the accounts of Plymale against him, and against various other persons, and when approached peaceably a short time thereafter with a request for the return of the book in an ordinary tone of voice, he refused to return it to its rightful owner. He began the quarreling and threats, and began to make preparation to carry out his threats. There is no evidence whatever that Plymale made any attempt to draw his pistol until after he had been severely beaten with the club; he had committed no overt act tending to indicate an assault, unless the fact that he had his hand in his pocket could be so construed. One of the State's witnesses, Browning, testified that Plymale usually had one or both hands in his pockets, a habit he had. Could the fact that he approached Morgan and asked for the return of his book, and followed him a few steps insisting on the return of his property be construed as indicative of an assault, or as an overt act evidencing a purpose to kill? He had a revolver, which he says he usually carried about his person as he carried considerable money and was in the habit of cashing checks at the post office. This revolver he says was in his pocket at the first assault at the post office, and he did not use it until he thought his life was in danger from the blows of the club. There is nothing to contradict this statement, except inferentially, the evidence of one witness that he had seen, before

that time on his visits to the post office, a pistol hanging on the wall near the safe in the post office.

The State's instruction No. 3 is not applicable to the facts and is misleading. From it the jury could infer that it was not necessary for Plymale to commit an overt act of violence, or begin the affray if he had his hand in his pocket, or that within 10 or 15 minutes after having been whipped by Morgan and not having recovered from the beating he approached Morgan with a pistol in his pocket in order to request the return of his property. It may have been unwise to do so, discretion might have been the better part of valor and dictated a request at a later and more propitious time; but would such action indicate an intention to renew the affray, and be construed as an overt act of violence, as this instruction might be interpreted to hold as a matter of law?

Moreover it must be remembered that Morgan was not without fault. He began the assault at the post office, then carried away Plymale's property without any right to do so, and refused its return to the owner when requested in a proper manner, accompanying such refusal by threats of violence. A prompt return of the book would likely have ended the matter, if he apprehended great bodily harm from the approach of Plymale.

We think it was error to give this instruction, and for that reason reverse the judgment, set aside the verdict and award defendant a new trial.

*Reversed and remanded.*