## SAWYER v. THE STATE.

EVIDENCE.—*Criminal Law.—Murder.*—On the trial of one for the murder of his wife, he offered to prove that the deceased had for a long time been having adulterous intercourse with one B. and others, and that he (the defendant) had for a long time been cognizant of the adulterous conduct of his wife.

*Held,* that the evidence offered was incompetent in justification or palliation of the offense; that after the lapse of time sufficient for the passion to cool and for reason to assume her sway, the killing was as criminal and indefensible as if the deceased had never been guilty of conjugal infidelity.

SAME.—*Insanity.*—Said offered evidence, in the absence of evidence tending to show the actual insanity of the defendant, was incompetent as tending to show insanity.

SAME.—A jury is not authorized to find a man to be insane, without proof on the subject other than the fact that a cause existed that might tend to produce insanity.

INSTRUCTIONS.—*Argument of Counsel.*—Where the whole case is fully and fairly placed before the jury in the series of instructions given, it is not error for the court to specially refer to and state the position assumed in the argument of counsel, upon a question in the case made prominent by the argument.

SAME.—*Insanity.*—Where the defense of insanity is interposed to a criminal prosecution, the court may direct the attention of the jury to the defense, and instruct them that the evidence relating to it should be carefully and intelligently scrutinized and considered.

APPEAL from the Vanderburg Criminal Circuit Court.

WORDEN, J.—The appellant was indicted for, and tried, and convicted of, the murder of his wife, Lizzie Sawyer, and sentenced to be executed. The case made against the accused by the evidence is, in substance, as follows:

The deceased, at the time of the homicide, was employed as chamber maid on the steamboat G. W. Thomas, which was then lying at the wharf in the city of Evansville, in Vanderburg county, in this State. On the morning of the 2d of February, 1871, one Delia Wilson, an acquaintance of the deceased, went on board the boat to see her. Soon after Delia Wilson went on board, the accused went on board the boat, and went to that part of the boat where the deceased and Delia Wilson were. The witness to this part of the transaction, Delia Wilson, says, that the accused did not seem to be angry, but spoke to her and the deceased very

pleasantly, and enquired after their health, and sat down by a table where the deceased was ironing. All three of the parties talked and laughed together for a while. After some casual conversation, the accused asked the deceased if she would go and live with him if he would get a house off Water street. The deceased made him no answer. The witness, Wilson, asked her why she did not answer him. The deceased replied, that the accused always came to her drunk,, and that was the reason she wouldn't talk to him. The accused then asked the deceased, addressing her as "baby," if she would go and live with him if he would get a house in another portion of the city; to which she replied that he knew her mind was made up;, that she had told him, when the boat was in port on the last trip, what she was going to do; that she then told him she never intended to live with him again. In the mean time, the accused had got up from where he had been sitting, and moved two or three steps, taking a seat near where the smoothing irons, which the deceased was using, were sitting. At the point of the conversation above stated, the appellant seized one of the irons, weighing between four and five pounds, and struck the deceased on the head therewith. He struck her twice before she fell, but kept on striking after she had fallen, as the witness says, as much as two dozen times. The witness became frightened, and ran into the pantry of the boat, and fastened the door, but she heard the deceased screaming for a minute or two after that, and then she ceased. When the witness came out of the pantry, she saw the appellant jumping from the boat to the river bank, with the smoothing iron in his hand. This witness also testifies that on the day before the murder she talked with the appellant, when, as she says, he seemed to think the deceased "had been spending his money on another man." The deceased had been in the boat about a month.

Edward Green, the cabin boy of the boat, heard screams of murder from the direction of the stern of the boat, and ran and opened the door leading from the ladies' cabin to

the washing and ironing room, and there saw the prisoner have the deceased down on the floor, with his knees on her breast, striking her on the head with the smoothing iron. When the witness opened the door, the prisoner ran at him and told him to get out or he would kill him. The witness ran out, when the accused shut the door and bolted it, and then began beating the deceased again. The porter of the boat came and broke the door open, at which time some six persons had gathered around, and the appellant, swearing he would kill all of them if they did not get out of the way, ran down on deck, and jumped off the boat. When the appellant left the boat, the parties went to where the deceased was lying, and found she was dead. Her head was brutally and horribly mangled.

After the appellant left the boat, it appears that he ran about two miles from town, but then returned and surrendered himself up to the officer, saying that he had concluded to come back and surrender himself up, because he knew he would be pursued and taken. He said, at different times after the murder, that if he had not killed the deceased, he had failed to do what he intended; that he killed her because she had been sleeping with one Bibbs and others, and that he only regreted that he could not kill Bibbs also. He also said he was now satisfied, and they might hang him, shoot him, or do what they pleased with him.

It was proved by another witness, who had some acquaintance with the appellant and his wife, that she did not know why the deceased left home to go on the boat, but that she was kept by another man by the name of Bibbs. On one occasion the appellant came home, and after talking with the deceased awhile about her conduct with other men, he said to her that if she did not quit running with other men he would smother her in her heart's blood; to which she replied, "well, then, you can kill me," and left the room. On another occasion, about three weeks before the murder, the appellant said to the deceased, that if she did not behave herself and quit running with other men, he would kill her.

It appears by the evidence that the appellant is below the average of mankind in point of mental capacity and intelligence, but he appears to us to have had abundant mind to be in every way responsible for his conduct; and we may add that, although there was evidence given to show, in the language of the bill of exceptions, "the causes that tend to produce temporary insanity," there was nothing in the case that shows any mental derangement on the part of the accused.

The appellant offered to prove "that the deceased, Lizzie Sawyer, had, for a long time previous, been having adulterous intercourse with a man by the name of Bibbs and others, of which adulterous conduct the defendant had, for a long time, been cognizant." This evidence was rejected, on objection made by the State, and the defendant excepted. This evidence, offered with a view to justify, or in any way palliate the offense, was utterly incompetent, and correctly rejected. It assumes that the defendant had, "for a long time," been cognizant of his wife's adultery. If he had been thus for a long time apprised of her guilt in that respect, there had been an abundance of time for the ebullition of passion, which might be supposed to arise on being first apprised of the fact, to subside. After the lapse of time sufficient for the passions to cool, and for reason to resume her sway, the killing was just as criminal and indefensible as if the deceased had never been guilty of conjugal infidelity. We do not determine what might have been the effect of the adultery of the deceased, had the homicide been perpetrated by the appellant immediately upon discovering the fact. It is sufficient to say that if the facts offered to be proven were established, they would, in no way, excuse or mitigate the offense. *State* v. *Samuel,* 3 Jones (N.C.), 74; *State* v. *John,* 8 Ired. 330. There might be numerous authorities cited upon the point, both ancient and modern, but it is deemed unnecessary.

It is claimed, however, that the evidence should have been permitted to go to the jury, on the ground that it tended to

establish the insanity of the accused.    It appears to us that the appellant had the full benefit, on the trial, of the fact that he believed that the deceased had been guilty of continued adultery, if that belief had any tendency to produce mental derangement.   His statements, before and after the murder, show that he entertained that belief, or perhaps we should say, that he knew the fact.   But the evidence, as offered, was incompetent for that purpose.

It was testified by a physician, that "any excitement, an impression that a great wrong has been inflicted upon a man, protracted thought upon any subject, and others that might be enumerated," are causes that tend to produce temporary moral insanity.   It is claimed, as we understand the argument, that inasmuch as the infidelity of the deceased was a great wrong inflicted upon the defendant, and inasmuch as his mind would protractedly dwell upon the subject, the evidence was competent, as tending to show the existence of an exciting cause of insanity.

This argument assumes that a jury may infer the existence of insanity from proof merely of the existence of a cause that may tend to produce it, without any proof whatever that the effect followed the cause.    If it were a case where a given effect *must* follow the cause, there would be force in the argument, because proof of the cause would be proof of the effect.    But we know that the various causes that may tend to produce insanity very frequently fail to produce any such effect; and it seems to us that it is not competent to prove the existence of such exciting cause unaccompanied with some proof that the effect followed the cause.    Indeed, a jury would not be authorized to find a man to be insane, without proof on the subject other than the fact that a cause existed that tended to produce insanity.    Thus, in the case of *Bradley* v. *The State*, 31 Ind. 492, the court below charged the jury, that "if it had been proved that the mother of the defendant was insane, and that insanity in the mother raises a strong presumption that it is transmitted to the offspring, yet it rests upon the defendant to prove that he was insane

at the time the act was committed. The facts that the mother was insane, that the twin brother of the mother was also insane, and that a cousin was insane, if proved, would not be sufficient, of themselves, to show insanity in the defendant, but are facts strongly tending to show hereditary insanity in the family, and proper for you to consider with the other testimony in the case, to aid you in determining whether the defendant was insane or not, when the act was committed." This charge was held to be correct.

The evidence offered was not accompanied with any offer of evidence to prove the actual insanity of the defendant, nor was there any evidence introduced that had any legitimate tendency to prove insanity; and, whatever might have been the law of the case had evidence been introduced or offered, in connection with that rejected, tending to prove the defendant's insanity, we think the evidence, as offered, was rightly rejected.

The appellant moved for a new trial, upon the ground, amongst other things, that the court erred in giving the first, second, third, fourth and eighth, instructions to the jury.

The charges given to the jury are too long to be here set out in full, but we find no error in them. They place the whole law of the case before the jury in quite as favorable a light as the appellant could ask. No objection is pointed out in the brief of counsel for appellant to any of the charges except the second, which is as follows. "If you shall find from the evidence that the prisoner, Sawyer, did the killing as charged in the indictment, then the next question for you to determine is, was the prisoner justifiable or excusable to any extent upon any of the grounds mentioned? The ground relied upon by the defense in this case to overcome this presumption of malice" (the presumption arising from the use of a deadly weapon, as explained in a previous charge) " is that of insanity. In other words, it is argued in behalf of the prisoner, that at the time of the commission of the act alleged in the indictment, he was not of sound mind, and, therefore, not responsible for the acts committed by him.

This defense is one very frequently made in cases of this kind, and it is one which, I may say to you, should be very carefully scrutinized by the jury. The evidence to this point should be carefully considered and weighed by the jury, for the reason that if the accused were in truth insane at the time of the commission of the alleged acts, then he ought not to be punished for such acts. The evidence on this question of insanity ought to be carefully considered by the jury for another reason, and that is, because a due regard for the ends of justice and the peace and welfare of society demands it, to the end that parties charged with crime may not make use of the plea of insanity as a means to defeat the ends of justice, and a shield to protect them from criminal responsibility in case of violation of law.

"It is not every slight aberration of the mind, not every case of slight mental derangement, that will excuse a person for the commission of an act in violation of law. The great difficulty is to determine, in cases where insanity is urged as a defense, the degree of insanity that will excuse a person for an act, which, if committed by a sane person, would be criminal, and would subject the offender to punishment.

"If you believe from the evidence that at the time of the alleged killing (if you shall find from the evidence that there was a killing as alleged in the indictment) the prisoner, Sawyer, was so far insane as not to be able to distinguish between right and wrong with respect to the act in question; or if you shall find from the evidence that he was urged to the commission of the act by an insane impulse so powerful as to overcome his will and judgment, so powerful that he was unable to resist it, even though he might know and feel that the act he was committing was wrong and a violation of law, no matter whether such insane impulse arose from mental or physical causes, or both, provided they were not voluntarily induced by himself; or if you should find from the evidence, that the prisoner was insane on any subject, no matter upon what, provided you find the insane impulse to do the act charged in the indictment arose from such in-

sanity, then, in contemplation of law, he would be insane, and you should acquit him."

It is objected to that portion of the charge which informs the jury that "the ground relied upon by the defense in this case to overcome the presumption of malice is that of insanity," that it diverted the minds of the jurors from the other grounds relied upon to overcome the presumption of malice, and was calculated to confuse and mislead them. Looking at the case as it appears to us from the evidence, and considering the circumstances and character of the homicide, and the instrument with which, and the manner in which, it was perpetrated, it is difficult to conceive of anything that would overcome the presumption of malice, unless it be a disordered and shattered intellect. But we do not think the court erred to the injury of the accused in giving undue prominence to the defense of insanity. In the series of charges, including that above set out, the whole case was fully and very fairly placed before the jury, and the prisoner had the full benefit of the law as applicable to his case. It may be further observed that in that portion of the charge above objected to, the court was but stating the case as it was argued to the jury by the counsel for the defendant, for the charge immediately proceeds as follows: "In other words, it is argued on behalf of the prisoner, that at the time of the commission of the act alleged in the indictment, he was not of sound mind," &c. We cannot say that the court misstated the positions of counsel or gave more prominence in the charge to the question of insanity than the counsel did in the argument.

It is also objected to the charge that it was calculated to prejudice the jury against the defense of insanity; that the jury were unduly cautioned to carefully scrutinze the evidence on that subject.

The observations of the court in that respect meet our unqualified approval. As stated by the court, where the defense of insanity is interposed to a criminal prosecution, the evidence relating to it should be carefully and intelligently

scrutinized and considered, for the double reason that a really insane person should not be convicted, and a really sane one should not be acquitted and suffered to go unpunished for his crimes, on the false theory of insanity.

We find no error in the case, either in relation to the evidence or the charge of the court, and are satisfied from the evidence that the verdict and judgment are in all respects right.

The judgment below is affirmed, with costs.

*T. L. Davis* and *J. G. Hollingsworth,* for appellant,

*W. P. Hargrave* and *B. W. Hanna,* Attorney General, for the State.