*Reversed; verdict reinstated, judgment for plaintiff.*

# CHARLESTON.

## STATE *v.* MRS. L. E. EVANS

Submitted May 9, 1923.   Decided May 22, 1923.

1. HOMICIDE—*Proof of Insanity; Insanity Must Consist of Lack of Power to Distinguish Between Right and Wrong.*

   In order to avail one charged with murder of the plea of insanity, it must be shown to the satisfaction of the jury by a preponderance of evidence that the defendant at the time of committing the homicide did not have sufficient power

of mind to distinguish between the right and wrong of the act. (p. 50).

2. SAME—*Evidence of Cause of Insanity Inadmissible, Unless Prima Facie Case Established.*

In a trial for murder where the defendant, a married woman, relies upon the defense of insanity caused by the elopement of her husband with the deceased, an unmarried woman; it is not reversible error to refuse evidence tending to corroborate the defendant's testimony of the alleged intimate relations between her husband and deceased, if it has not been substantially shown that the defendant at the time of committing the homicide was incapable of distinguishing between the right and wrong of her act, so that the evidence excluded and that introduced would be sufficient to constitute a prima facie case of such degree of insanity. (p. 50).

3. CRIMINAL LAW—*Admission of Improper Evidence Not Reversible Error, When it Clearly Appears That Result not Changed if Excluded.*

The admission of improper evidence will not constitute ground for reversal when it clearly appears that if such evidence had been excluded the result could not thereby have been changed. (p. 54).

Error to the Circuit Court, Kanawha County.

Mrs. L. E. Evans was convicted of manslaughter, and she brings error.

*Affirmed.*

*M. F. Matheny, Geo. P. Stewart* and *John L. Gillispie,* for plaintiff in error.

*E. T. England,* Attorney General, and *R. A. Blessing,* Assistant Attorney General, for the State.

LITZ, JUDGE:

This writ of error was awarded to review the judgment of the intermediate court of Kanawha county rendered June 2d, 1922, sentencing the defendant to five years confinement in the penitentiary on conviction for voluntary manslaughter, under an indictment returned by the grand jury of that county January 10th, 1922, charging her with the murder of Dovie Edds in Kanawha county, October 24th, 1921;

such judgment having been affirmed by the circuit court of said county.

It appears that the deceased, Dovie Edds, an unmarried woman twenty-nine years of age, reared in Nicholas county, was, during parts of 1919, 1920 and 1921, engaged as a public school teacher in the neighborhood of Fayette Station, Fayette county, where the defendant, a married woman, (forty-eight years of age at the time of the trial), resided with her family, consisting of her husband and a number of children; that some of the defendant's children attended the school taught by the deceased at that place, and the deceased, while conducting this school visited the home of defendant. It is claimed by the defendant that her husband, Ed. Evans, during this time became intimate with deceased, and disappeared from his home in April or May, 1921, about the time the deceased left that community; and that up to the time of the tragedy he had remained at large, living with the deceased in Charleston, St. Albans, Williamson and at other places in the State.

The defendant, on several occasions previous to the tragedy, had quarreled with, and threatened the life of, deceased. On or about the 21st day of October, 1921, defendant left her home at Fayette Station and came to Charleston, a distance of about 50 miles, to the home of her son-in-law, William H. Boggus, where she established headquarters for the execution of plans. On the 23d of October she took a trip from Charleston to Malden, a distance of a few miles, for the purpose of ascertaining from Jean White, President of the Board of Education of Malden District of Kanawha County, the name of the post office where the deceased, "a very close friend of hers", as defendant claimed, was teaching school in that district. White wrote the name "Cinco" and gave it to her. On the morning of October 24th, Boggus went to Cinco, and while there inquired of Mrs. J. G. Frazier, whose husband was superintendent of the New Export Coal Company at that place, if deceased was boarding at her home. The deceased had been boarding at this home for six weeks, while serving as principal of a two room public school in the

community. Upon being advised in the affirmative, he returned to Charleston and there informed the defendant, about 11 o'clock a. m., where deceased could be found. Soon after noon the two secured passage on an automobile for Cinco. Upon their arrival, Boggus remained at a store, about 250 feet from the Frazier home, while the defendant, robed in black, with a heavy black veil, and pistol hid under her coat, proceeded on her mission. She stopped in front of the home of J. W. Hill, next door to Frazier's, and asked where the "school teacher" was boarding. Upon being directed by Mr. Hill to the Frazier home, she walked to the Fraziers' front gate. Just at this time Mr. Frazier, who was coming home opened the gate and let her in the yard. She continued her course through the yard and upon the front porch, while he went around the house, entering at the rear door. She was met by the deceased and Mrs. Frazier at the front door. Deceased invited defendant to sit down on the porch until she (deceased) finished dressing. At this Mrs. Frazier, leaving deceased in the front room, passed into an adjoining room. Immediately thereafter, Mr. and Mrs. Frazier heard defendant, who had gotten into the front room, say to deceased, "Girl, tell me where my husband is, or I will kill you." As the deceased quickly answered, "I don't know," the defendant began firing with an automatic pistol and had fired three or four shots into the deceased, who had fallen with defendant standing across her body, when Mr. and Mrs. Frazier got into the front room. Defendant then turned the gun on Mrs. Frazier, and in the scuffle between Mr. Frazier and defendant, it was discharged twice, one shot penetrating the clothing of Mrs. Frazier and the other inflicting a flesh wound on the defendant. The deceased died instantly After Frazier had with difficulty wrenched the gun from defendant, he said to her, "Why did you come to my house and kill that woman like that?"—to which defendant replied, "The only thing I wish I had got another shot before you got the pistol".

The defendant was taken into custody and Boggus, who attempted to escape, was also arrested a mile or two away.

At the trial the defendant seems to have relied upon insanity to excuse her act, although no special plea to this effect

was filed, the theory of the defense being that defendant had become distracted in mind on account of the fact, or belief, that her husband and deceased had been living together.

Defendant, in her testimony, claims that she has no recollection of the tragedy, but admits wearing on that occasion the same dress she had on at the trial, and that she got the pistol from a man boarding at her home by the name of Smith. She also tells about the alleged intimate relations between her husband and the deceased and other matters in connection therewith, giving dates and places, and of having followed them to Charleston and Williamson.

Her son-in-law, Boggus, who assisted in locating her victim, accompanied her on the fatal mission, and was arrested in his flight from the place of the tragedy, undertakes to say that previous to the shooting defendant wouldn't talk or eat, and didn't sleep. His wife, daughter of defendant, gives similar testimony. They do not say that defendant, however, did not know right from wrong. Mrs. Boggus testifies her mother was attending to busineess in Charleston on the morning of the tragedy while Boggus was gone to Cinco to locate the boarding place of deceased. This is the only testimony offered to establish the alleged insanity of defendant, except the following evidence of the witness, F. V. Kincaid:

"Q. What was her condition, as you observed it?

"A. Well, she seemed to be bothered a good deal. She couldn't talk about the crime, and was always talking of her husband and the condition of her children.

(On cross-examination):

"Q. Mr. Kincaid, you do not mean to tell the jury Mrs. Evans did not know right from wrong, do you?
"A. No."

There was no request on behalf of the defendant for postponement or continuance of trial to obtain evidence of her insanity, and no instruction was requested presenting the defense of insanity to the jury. She kept boarders, and no doubt there were numerous other intimate acquaintances by

whom her mental condition could have been shown if she were
so crazy as not to know right from wrong.   In view of this,
and the fact that Boggus and wife, son-in-law and daughter
of defendant, did not claim defendant's mind had changed
since the shooting, the jury, in our opinion, could give no
weight to their testimony, nor to the defense of insanity.

Counsel for defendant in oral argument called attention
to the fact of defendant's effort to shoot Mrs. Frazier, who
attempted to interfere, as indicating insanity of the defend-
ant.   May not such conduct tend directly to prove viciousness
and jealous rage rather than insanity?   Insanity excusing
crime cannot be predicated merely upon the atrocity or
enormity of the defendant's act.   *Singleton* v. *State*, 71 Miss.
782, 16 So. 295; *Turner* v. *State*, 119 *Tenn.* 663, 108 S. W.
1139.

It is suggested further, as evidence of defendant's insan-
ity,. that she had reduced greatly in weight, after being de-
serted by her husband.   She says her weight was 212 pounds
at the time of the desertion, but was only 140 pounds on the
day of the homicide.   Such reduction to what may be a
healthy and normal weight would not necessarily produce
weakened vitality or mind.   Besides it appears that the de-
fendant possessed such physical strength it was with great
difficulty that Mr. Frazier was enabled in the scuffle to wrench
the pistol from her hand.

After the trial the defendant in support of her motion to
set aside the verdict as being contrary to the law and the evi-
dence, filed the affidavit of M. V. Godbey, M. D., stating
that on the 25th day of April, 1922, he examined the defend-
ant and "at the time of her said examination found that she
was not normal mentally—she was slow in speech and had
apparent confusion of ideas, symptomatic of manic-depres-
sive psychosis,—which is a form of insanity, with symptoms
indicating that such conditions had existed for some time".
This affidavit of course could not be considered on such
motion.   Assuming that it was proper evidence in the case, it
does not show the degree of the defendant's insanity or that
the form and extent of such insanity rendered her incapable
of knowing right from wrong or of forming a criminal in-

tent. A person partially insane is yet responsible for a criminal act, if at the time of the act he knows right from wrong. *State* v. *Cook,* 69 W. Va. 717; *State* v. *Maier,* 36 W. Va. 757; *State* v. *Harrison,* 36 W. Va. 729. Judge BRANNON, discussing the defense of insanity excusing crime in the last case, observes:

''The operations of the human mind are wonderful, mysterious, and occult. Insanity is one of its melancholy and impenetrable conditions. Its types and phases are infinite and dark. Volumes upon volumes have been compiled by writers upon medical jurisprudence, mental philosophy, and law to pierce its depths, and find the general rules which shall tell criminal courts what degree and character of insanity shall avail to excuse crime; but no general rule universally applicable has been or can be found, because, as Mr. Bishop says, it is not in the nature of the subject to extract such a rule from it. I know of no better rule than the 'right and wrong' test as above stated''.

The State proved by various witnesses, including Jean White, President of the Board of Education of Malden District, from whom defendant had, on the preceding day, obtained the post office address of the deceased, J. G. Frazier, who was present at the tragedy, the driver of the automobile in which the defendant and Boggus were taken to Cinco, and E. J. Gross, family doctor of defendant, that she was sane.

There is no specific claim in the evidence offered in behalf of the defendant that she did not, at the time of the tragedy, know right from wrong. This is the test in determining criminal intent or responsibility.

The trial court is charged with having committed error:

(1) In the exclusion of evidence offered in behalf of defendant, tending to show the unchaste character of deceased; and,

(2) In the admission of evidence in behalf of the State, tending to prove the good character of deceased respecting virtue and chastity, at least up to the time it is alleged she eloped with defendant's husband.

The evidence, exclusion of which constitutes the principal

cause of complaint, consists of several letters alleged to have been written by the deceased to F. V. Kincaid, postmaster at Fayette Station, after she left there in May, 1921, and the proffered testimony of Kincaid, in connection with the same, that deceased had, before leaving Fayette Station, instructed him to forward mail addressed to her or Ed Evans, as she should thereafter direct. This evidence, which it is claimed had been communicated to defendant before the tragedy, had as its object the corroboration of defendant's testimony that her husband and the deceased had been living together at Charleston, St. Albans and Williamson, after they left Fayette Station, which she claims distracted her mind.

Counsel for defendant say that "These letters were relevant and should have been permitted to go to the jury, not for the purpose of establishing the bad character of the deceased, but for the purpose of showing that the loss of prisoner's husband was traceable directly to the deceased and therefore formed a basis of the prisoner's insane impulses". Had it been substantially shown that the defendant was at the time of the commission of the act insane to the extent of being unable to comprehend right from wrong, then the action of the court refusing the evidence in question would have constituted error. *Sawyer* v. *the State,* 35 Ind. 80. There was no such foundation laid for the admission of this evidence.

"Rulings by the trial court on the admissibility of evidence will not constitute sufficient ground for the reversal of a judgment, unless the appellate court is able to perceive substantial prejudice resulted therefrom." *State* v. *Farley,* 78 W. Va. 471.

We can perceive no substantial prejudice to the defendant resulting from the exclusion of this evidence for the reason that it, if admitted, with other evidence introduced would not be sufficient to establish a prima facie case of insanity, entitling the defendant to an instruction to the jury upon such theory of defense.

In the case of *State* v. *Cook,* 69 W. Va. 722, 72 S. E. 1025, wherein the defendant relied on the plea of insanity produced by the confession of his wife on the night of the tragedy that she and deceased had had

sexual relations, the Court said: "In our opinion the evidence was wholly inadequate to even rebut the presumption of sanity justifying any instructions on the subject. There is no evidence that the frenzy or ungovernable passion, the irresistible impulse of the prisoner, on the night of the homicide on hearing the confession of his wife, was the result of mental disease, as distinguished from weakness or passion. 'Mere frenzy, or ungovernable passion, however furious, is not insanity within the meaning of the criminal law. 1 Whar. and Stille's Med. Jur. sec. 163.' * * * * * Such also is the doctrine of our case of *State* v. *Harrison,* 36 W. Va. 729, where the 'right and wrong test' is held to be the true test. In the case at bar there is no substantial evidence of any mental disease of the prisoner before or after the homicide."

In Wharton's Criminal Evidence, section 335-a, the rule is stated as follows: "The accused may be criminally responsible though at the same time he suffers from derangement, while he is still sufficiently under the guidance of his reason as to be legally responsible for his acts".

The State, over the objection of defendant, introduced evidence tending to show the good character of deceased respecting virtue and chastity, at least up to the time she is alleged to have become intimate with the defendant's husband. We think this evidence should not have been admitted; but as the defendant in her testimony had improperly gone into the question without first having made the necessary showing of her alleged insanity, she can not complain. The jury evidently believed the defendant that her husband and deceased had maintained improper relations with each other, which accounts for their verdict being for manslaughter only. The admission of improper evidence will not constitute ground for reversal when it clearly appears that if such evidence had been excluded the result could not thereby have been changed. *State* v. *Davis,* 68 W. Va. 142; *State* v. *Hull,* 45 W. Va. 767.

We find no ground for reversal.

*Affirmed.*