STATE OF WEST VIRGINIA

*v.*

DAVID LEE GRIMM

(No. 13076)

Submitted January 17, 1973.    Decided April 10, 1973.

*Richard F. Pence, Thomas M. Munchmeyer,* for plaintiff in error.

*Chauncey H. Browning, Jr.,* Attorney General, *Willard A. Sullivan,* Special Assistant Attorney General, *George E. Lantz,* Deputy Attorney General, *Richard E. Hardison,* Assistant Attorney General, for defendant in error.

BERRY, PRESIDENT:

This is an appeal by David Lee Grimm, the defendant, from a final judgment of the Circuit Court of Wood County, West Virginia, entered September 17, 1970 upon a jury verdict which had found the defendant guilty of murder in the first degree with a recommendation of mercy. The defendant had been indicted by the grand jury of the Circuit Court of Wood County, West Virginia, at the October, 1969 term of court for the murder of Charles C. Hardman, for which he was tried and convicted. He was also indicted for two other felonies committed

at the same time, which have not been disposed of. Defendant's primary contention at the trial and on the appeal is that he was not guilty by reason of insanity.

A writ of error was granted by this Court on March 29, 1971 to the judgment on the conviction of the defendant for the murder of Charles C. Hardman. On September 16, 1972 the case was continued generally, and on January 16, 1973 it was submitted for decision upon the arguments and briefs of counsel for the respective parties.

The incident which led to the trial of the defendant occurred about 3:30 a.m. on August 20, 1969 at Ada's Club in Parkersburg, West Virginia. The defendant, who had been in and out of the club several times that night, left the club shortly after 3 a.m. About twenty minutes later, after apparently returning to his home and changing into green Marine fatigues, he returned to the club and threw a tear gas grenade through a small hole in the front door which was used as a "peep hole", ran across the street and partially hid behind an abutment and then began firing with a high-powered rifle when the people inside the club ran out, killing William Plant, Jr. and Charles C. Hardman and seriously wounding John Simons. These three men were the only ones in the club who ran outside when the tear gas grenade exploded.

The defendant had apparently moved his car from the area next to the club to a parking lot down the street when he left the club shortly after 3 a.m. After shooting the three men he ran down the street toward his car. At this time, two bank couriers, who had driven into the parking lot in order to make a delivery to the bank, saw the defendant running across the lot. The defendant got into his car, but almost immediately jumped out of the car, with his rifle, and ran toward the drive-in window of the bank. The courier who was driving stopped his car and started backing up. The defendant shot twice at the car and one of the bullets hit the courier sitting in the passenger seat, wounding him in both legs.

The defendant then ran down an alley and upon seeing a black parking attendant shot at him. The attendant testified that before the shot was fired he saw a man zig-zagging across the street with a rifle above his head. The attendant testified that after the shot the man stood in the middle of the street and was shouting, although this witness and another witness, a lady who worked at the Uptowner Inn, testified they were unable to understand what he was shouting. Apparently, the defendant then ran by the Uptowner Inn and shot at three people who were attempting to get in the side door of the Inn. No one was wounded by any of those shots.

Another witness, Lawrence Walters, testified that he heard shots as he was driving home from work. He stated that the defendant ran beside his car to within three feet of him and yelled, "You son-of-a-bitch, I've already killed four or five, might as well kill you." The defendant then shot this witness in the neck, ran across the street and disappeared.

Two brothers, George and Denver Starcher, ages 13 and 15, who were delivering newspapers that morning, testified that the defendant came up to them and told them that he wasn't going to shoot children " * * * cause they don't know, he was just going to shoot bad people and negroes." He told them to start running, then shot near the feet of one of the boys and fired another shot over their heads as they ran down the street. They stated they saw the defendant soon after that walking down the street carrying his rifle.

The police, accompanied by the defendant's brother, Paul Douglas Grimm, went to the defendant's home in Parkersburg and found him asleep in bed at 6:30 a.m. He was in a deep sleep and his brother had to shake him, as it was difficult to awaken him. Upon awakening, the defendant said, "Just what in the Hell's going on?" The defendant appeared nervous and pale at the time. The police arrested him and he appeared before a justice of the peace soon thereafter.

The police found the clothing the defendant had worn during the shootings as well as a pair of tennis shoes in a room adjacent to the bedroom. The shoes and clothing were wet. Later, the same morning, the police found the rifle and a pouch in which the defendant had carried a land mine and another tear gas grenade in a small creek underneath a bridge about three tenths of a mile from the defendant's home. The rifle was found in about 18 inches of water.

John Simons, the only one of the three men who survived the shootings at Ada's Club, testified that he saw the defendant shooting at him when he ran out of the club after the tear gas grenade was thrown into the club. Lawrence Walters, the man who was shot in the neck, as well as the two Starcher boys, also positively identified the defendant. In addition, a ballistic expert testified that the spent cartridge shells found at different places where shooting occurred, were fired from the defendant's rifle which was found in the creek near his home.

The state introduced into evidence the testimony of several witnesses to show that the defendant had a motive for the shooting at Ada's Club. One of the barmaids at Ada's Club testified that she overheard the defendant telling his brother, Doug Grimm, who was a bartender at Ada's Club, that: "I'll get even with the son-of-a-bitch", while he was looking in the direction of Charles C. Hardman. She testified that this occurred shortly after 3 p.m. on August 19, 1969, approximately twelve hours before the shooting. She testified that Mr. Hardman had shortly before ordered Douglas Grimm to get out from behind the bar since Doug was not on duty at that time.

The janitor at Ada's Club testified that he saw the defendant in the club on the afternoon of August 19th between 1:30 and 4:00 p.m. He also testified that he heard the defendant tell Mr. Hardman about 6 p.m. on August 18th, "I'll get even with you, you son-of-a-bitch", after Mr. Hardman refused to admit him into Ada's Club because he had tried to bring a bottle into the club with him.

Witnesses testified on behalf of the defendant that he was not in Ada's Club during the afternoon of August 19th and that Mr. Hardman was not there that afternoon either. Witnesses on behalf of the defendant also testified that he was at work until 2:51 p.m. on August 19, 1969, and that he did not go to Ada's Club until about 6:30 that evening.

It appears that about 2:30 a.m. on August 20, 1969 the defendant reappeared at Ada's Club after having been there earlier and was first refused admission by John Simons because he was carrying a mixed drink in his hand. However, defendant's brother, who was working behind the bar, told Simons it was all right to admit him. Shortly thereafter, John Simons and Doug Grimm got into an argument and went outside to fight. However, the argument was settled before any blows were struck.

The defendant, who had an intelligence quotient of 127, testified in his own behalf and stated that he remembered being at Ada's Club on several occasions on August 19 and 20, 1969 but that after he left the club shortly after 3 o'clock in the morning of August 20th he didn't remember anything about the shooting that occurred at the club or the subsequent shootings. He testified that he remembered being in the swing on his porch, in the bushes in his yard, and that he also remembered being on the grass at the high school, which apparently was some distance from his home, and seeing artillery shells exploding overhead. He said he didn't remember anything else until he was awakened by the police and his brother in his bedroom, which was about 6:30 on the morning of August 20, 1969. He also stated that he had kept the land mines and tear gas grenades hidden under the sink at his home after his discharge from the service.

The defendant testified that he had enlisted in the Marine Corps in 1964 at the age of seventeen and served about four years, during which time he served about thirteen months as a combat engineer in Vietnam. He testified during the trial that on one occasion while he was in Vietnam his unit came under sniper fire while

they were working on a bridge, and while he was seeking cover an ax fell and hit him on the head rendering him unconscious for a period of time. He testified that after the accident he frequently suffered from severe headaches.

After the defendant was arrested he was taken before a justice of the peace who filed a petition with the Circuit Court, which was prepared by the defendant's attorney, asking that a mental examination be given to the defendant under the provisions of Code, 62-3-9, as amended. At a subsequent hearing before the Circuit Court the justice of the peace testified that at about 7 o'clock a.m. on August 20, 1969 when the defendant appeared before him, the defendant made irrational statements, called everyone communists, slapped his hands down on the table and used profanity. The defendant was examined by two medical doctors at the direction of the Circuit Court. Both doctors stated that he had a definite mental problem. However, the Circuit Court dismissed the petition filed under the provisions of Code, 62-3-9, as amended.

The jailer, Harry Owens, who had observed the defendant since he was placed in jail on August 20, 1969, stated that he had given him no trouble, and that he talked as normally as anyone else, but that he got nervous and upset at times when his lawyer came to the jail to talk with him.

The defendant was indicted for three felonies, two for first degree murder and one for felonious assault. After the hearing on the petition of the justice of the peace was dismissed, and upon arraignment the defendant entered two pleas, not guilty and not guilty by reason of insanity. The defendant then moved the court, in writing, to inquire into his mental capacity to ascertain whether or not he was of such mental capacity to stand trial on the charges against him. On February 17, 1970 the court, on motion of the state, ordered that a mental examination be made of the defendant, after which the court ordered a jury trial to determine the defendant's capacity or competency

to stand trial. There was conflicting testimony by two psychiatrists at the trial, which was held February 24, 1970, and the jury was unable to reach a verdict, whereupon, the court dismissed the jury. On May 6, 1970 the court entered an order holding that the defendant was competent to stand trial based on the hearings held before the court and the jury trial. The state elected to proceed to trial on the indictment charging the first degree murder of Charles C. Hardman. The trial began on May 11, 1970 and ended May 22, 1970 with the jury finding the defendant guilty of first degree murder.

There was conflicting testimony at this trial with regard to the defendant's sanity. The two psychiatrists who testified, one for the defendant and one for the state, differed sharply on this matter. Dr. Robert Jenkins, the psychiatrist who testified on behalf of the defendant, testified that he had examined the defendant several times at the request of the defendant's family and he was of the opinion the defendant was suffering from a mental disease known as schizophrenia paranoia and that the defendant did not know the consequence of his acts, or the difference between right and wrong at the time of the shootings on August 20, 1969. He examined him for about fifty minutes on September 4, 1969 and on other occasions over a period of several months, although he did not have the benefit of psychological examinations. He testified that the headaches the defendant claimed he had were consistent with the mental disease schizophrenia. He suggested that the defendant might even have temporal lobe epilepsy as a result of a head trauma which tended to make people extremely violent and cause them to commit antisocial acts of which they have no recollection afterwards. Dr. Jenkins stated that the defendant had been taking medication which had helped him.

However, in answering questions propounded by the court, Dr. Jenkins stated that the defendant knew at the time of the trial that it was wrong to kill someone and also knew the difference between right and wrong. This was brought out by the following questions and answers:

*"THE COURT*: Doctor, if the defendant were to have in his hands today, a loaded and cocked rifle, and aimed it at you or me, and pull the trigger, would he know that pulling the trigger, aiming it at you or me, would kill you or kill me?

A. I think that he might today, . . . . he perhaps would today.

Q. All right, when did he acquire that ability to know the consequence of his act?

A. I can tell you this, that he has been on medication which is specifically designed to help him to organize his thinking and control his anxiety and there has been a gradual improvement as far as this is concerned, in his thinking.

Q. You are unable to say when he got over it?

A. I would say that by the time I talked with him on say February 23, I believe it was, that I had seen a considerable improvement over what I had seen initially.

Q. In your opinion, does he know right from wrong today?

A. Today I think he does. Right now, yes sir."

On the other hand, Dr. Medih Aykoler, a psychiatrist at Spencer State Hospital, who, at the direction of the court, examined the defendant over a period of three days in February, 1970, observing him day and night, during which time he gave the defendant the recognized psychological tests, testified on behalf of the state. His testimony was in direct conflict with Dr. Jenkins. He testified that the defendant was not a schizophrenic paranoid, that a schizophrenic paranoid would not have continuous headaches, and in order to ascertain whether a person was a schizophrenic paranoid psychological tests must be made in addition to the psychiatric examinations. He also testified that both psychological and psychiatric tests were given to the defendant at Spencer State Hospital under his supervision. He stated that schizophrenia paranoia is a permanent mental condition, and that a

person with this illness may be set off by the use of alcohol or drugs to do violent acts. He also stated that a schizophrenic paranoid would not have a steady work record. The defendant had been working at the same place since his release from the service the previous August. He stated that the tests given to the defendant while he was in the hospital, which included the Rorschach test, the Bender-Gestalt test and Wechsler test, as well as an EEG test, did not show any brain damage. He further stated that he did not think it possible for a person to go into a psychotic state without the use of alcohol or drugs, or without someone provoking him. He also stated that the use of drugs never cures a schizophrenic paranoid and that the defendant was not given any drugs while he was in the hospital during his examination.

Dr. Aykoler stated that it was very uncommon for a person to become a schizophrenic paranoid at the age of 22, the age of the defendant, because the illness usually does not appear until the late 20's. He also stated that he was unable to determine whether or not the defendant knew the difference between right and wrong at the time the crime was committed.

The defendant listed 31 assignments of error in his brief. However, many of the assignments relate to the same matters and can be consolidated into three main categories as follows: 1. The objections to the hearing and dismissal of the petition filed by the justice of the peace and the court's order relating to the defendant's mental capacity to be tried; 2. the trial court's examination of the defendant's psychiatrist; 3. the instructions with regard to the defendant's plea of not guilty by reason of insanity.

The first assignment of error pertains to the petition or application of the justice of the peace for an inquiry as to the defendant's mental condition, under the provisions of Code, 62-3-9, as amended, and the jury trial ordered by the trial court to ascertain the defendant's mental capacity to stand trial.

There is no merit to this assignment of error. In accordance with the provisions of Code, 62-3-9, as amended, the judge appointed two medical doctors to examine the defendant and to report to him in writing the defendant's condition. This was done and the judge, being dissatisfied with the report of the doctors, dismissed the petition and ordered a jury trial to ascertain the defendant's mental condition. Conflicting evidence was introduced and the jury could not reach an agreement. The jury was subsequently discharged. The court on proper motion directed that a mental examination be made of the defendant by a psychiatrist at the Spencer State Hospital before ordering the jury trial on the question of the defendant's mental capacity to stand trial. As a result of all these preliminary procedures, the court was of the opinion that the defendant had the mental capacity to stand trial for murder. This was the proper procedure for the court to follow in a case of this kind. All of these steps were merely to help the court ascertain whether or not the defendant should stand trial. The court followed the provisions in the statute after the justice of the peace filed his petition with him but after receiving the doctors' reports he was not satisfied and directed that a jury be empaneled to try the issue. This procedure has been approved in this state and was merely to inform the conscience of the court whether the trial ought to proceed. *State v. Harrison,* 36 W.Va. 729, 15 S.E. 982. Although almost two and one-half months elapsed from the time of the first jury trial on the issue of the defendant's mental capacity and the time the trial court ruled that the defendant was competent to stand trial on the murder indictment, this was not an abuse of discretion on the part of the trial court.

The second assignment of error dealing with the trial court's examination of the defendant's psychiatrist is not well taken. The authority cited by the defendant to support this contention is the case of *State v. Loveless,* 140 W.Va. 875, 87 S.E.2d 273, which is not applicable to the case at bar. In the *Loveless* case the court called two

witnesses as court's witnesses and conducted a full scale examination, asking 303 questions. In the instant case the court merely propounded six questions to a witness called by the defendant. The *Loveless* case indicated that it was not only a right of the court but in some instances a duty to call witnesses or examine witnesses during the trial of a case.

The third assignment of error dealing with the question of defendant's sanity and the instructions to the jury pertaining thereto by the court is the main issue in this case.

It is the contention of the defendant that the M'Naghten Rule, which provides that a defendant who pleads not guilty for the reason of insanity must not know the difference between right and wrong at the time the crime was committed before he will be found legally insane, is outdated. This Rule was adopted in 1843 in *M'Naghten's Case,* 10 Clark & Fin. 200, 8 Eng. Rep. 718. It was approved in this state many years ago and is set out clearly in the case of *State v. Harrison,* 36 W.Va. 729, 15 S.E. 982, decided in 1892 and followed since that time. *State v. Evans,* 94 W.Va. 47, 117 S.E. 885; *State v. Fugate,* 103 W.Va. 653, 138 S.E. 318; *State v. Painter,* 135 W.Va. 106, 63 S.E.2d 86.

The defendant contends that the so-called "irresistible impulse" test should be considered in connection with the M'Naghten Rule of right and wrong, and cites authorities in many states which have combined these tests as authority for his contention. The "irresistible impulse" test was incorporated in instruction 18 offered by the defendant and refused by the court. However, under the evidence in this case, "irresistible impulse" is not involved because the defendant testified he did not remember anything for a period of about three hours, during which time the shootings occurred. The evidence also indicated that the shooting at Ada's Club was planned and executed with deliberation. The "irresistible impulse" test was rejected in this state in the case of *State v. Painter, supra,*

and we think rightly so, because in our opinion it is misleading and would tend to confuse the jury. It was aptly criticized in the case of *Durham v. United States*, 214 F.2d 862, 45 A.L.R.2d 1430, wherein the following language appears: "The term 'irresistible impulse,' however, carries the misleading implication that 'diseased mental condition[s]' produce only sudden, momentary or spontaneous inclinations to commit unlawful acts."

Many of the assignments of error deal with the giving or refusing of instructions by the trial court. Many of the instructions offered by the defendant were peremptory instructions which were properly refused, along with other instructions which were not supported by the evidence, or were improper statements of law. Defendant's instruction number 18, dealing with "irresistible impulse" and refused by the trial court, was not specifically listed in the 31 assignments of error and the only reference to it was contained in the defendant's reply brief. However, the contention that it was error not to instruct the jury to consider the "irresistible impulse" test was fully presented in the argument and brief on behalf of the defendant.

It is the law in this state that a plea of not guilty by reason of insanity is an affirmative defense, and the defendant has the burden of proof on the issue of insanity and must prove it by a preponderance of the evidence. *State v. McCauley*, 130 W.Va. 401, 43 S.E.2d 454; *State v. Evans, supra.*

It is the contention of the defendant that he was entitled to an instruction telling the jury the procedure to be followed if it returned a verdict of not guilty by reason of insanity. Instruction 20A, offered by the defendant and refused by the court, would have told the jury that if its verdict were not guilty by reason of insanity the judge would inquire into the defendant's mental condition and take appropriate action. If an instruction of this nature were given it would indicate to the jury that if it found the defendant not guilty by reason of insanity he would be

confined to an institution for the protection of society. However, this instruction would be improper because this would advise the jury of a form of "punishment" that would be given to the defendant and the weight of authority is that "punishment" is a matter for the court to consider and not for the jury and such instruction is not proper. *Pope v. United States*, 298 F.2d 507; *State v. Bracy*, 215 N.C. 248, 1 S.E.2d 891; *State v. Hood*, 123 Vt. 273, 187 A.2d 499, Anno., 11 A.L.R.3d 732.

All of the so-called rules or tests which have been proposed and used in connection with a plea of not guilty by reason of insanity have been criticized. The M'Naghten Rule has been criticized because it deals only with cognition and ignores volition entirely. In the case of *Durham v. United States, supra,* the court stated that the right and wrong test which considered knowledge or reason alone was an inadequate guide in determining responsibility for criminal behavior, and formulated the so-called Durham Rule wherein an accused is not criminally responsible for a crime if his unlawful act was the product of a mental disease or a mental defect. However, we do not approve of the use of the Durham Rule in this state because we feel it is subject to misinterpretation for the reason that it prescribes a test which is too diagnostic and would tend to confuse the jury. The American Law Institute studied this problem, and about eight years after the *Durham* case was decided adopted the Model Penal Code in 1962, which contained a proposed rule in connection with this problem, in the following language in § 4.01:

"(1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law.

"(2) As used in this Article, the terms 'mental disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct."

This rule was approved in the case of *United States v. Chandler*, 393 F.2d 920.

Instruction number 18A offered by the defendant and given by the court stated that if the jury believed that at the time the offense was committed that " * * * he was suffering from such a diseased and defective condition of the mind that he was incapable of knowing the nature and consequences of his act or if he did know what he was doing that he did not know that it was wrong and that such defect of mind and reason resulted from a diseased mind and was more than a delusion or an excess of passion or anger, you should find the defendant * * * not guilty by reason of insanity * * * ." This was a proper instruction under the facts and circumstances in this case.

A review of the evidence in the case at bar reveals that the defendant received a fair trial. The trial court allowed full inquiry and testimony with regard to the mental condition of the defendant. There was no restriction of the testimony by the psychiatrists and this court hereby approves this procedure in cases of this kind.

It is true that there was a conflict in the testimony of the psychiatrists. The psychiatrist who testified on behalf of the defendant, Dr. Jenkins, stated that the defendant was a schizophrenic paranoid and did not know the consequences of his acts at the time he committed such acts because of his mental disease. The psychiatrist who testified on behalf of the state, Dr. Aykoler, unequivocally stated that the defendant was not a schizophrenic paranoid, who, he stated, is a person with a permanent mental disease or mental defect, and that such a person can never be cured. His testimony was to the effect that when he examined the defendant at the Spencer State Hospital the defendant appeared normal. However, Dr. Aykoler did find evidence of hostility and anger but stated that it was not extreme and that the defendant's thinking was organized. Dr. Aykoler also testified that a person would not go into an acute psychotic state without the use of alcohol or drugs or without being provoked.

It has been held that temporary abberation, which sometimes accompanies or follows intoxication, and is often accompanied by delusions, hallucinations, and illusions, is not such insanity as confers legal irresponsibility. *Porter v. State,* 140 Ala. 87, 37 So. 81; 1 WARREN ON HOMICIDE, § 61.

The case at bar is somewhat similar to the case of *State v. Angel,* 154 W.Va. 615, 177 S.E.2d 562, in which a psychiatrist who testified on behalf of the defendant stated that the defendant was a schizophrenic paranoid and that the defendant did not remember killing the victim. However, other psychiatrists testified that he did know the consequences of his act and on this conflicting medical testimony the defendant was found guilty by the jury, and the conviction, upon appeal to this Court, was affirmed. It would appear in the case at bar that the jury considered the conflicting evidence as to whether or not the defendant knew the consequences of his acts and found him guilty of the crime for which he was charged.

The primary issue involved in this case is whether or not the jury was properly instructed on the question of the defendant's insanity. In the instant case the defendant testified at the trial and stated that he did not remember anything for a period of about three hours during which time the crimes were committed. The defendant had been at Ada's Club on several occasions the evening before and the morning the crimes were committed during which time he had been drinking. He left Ada's Club shortly after 3 a.m. on August 20th and returned about twenty minutes later after changing his clothing and obtaining a high-powered rifle, a tear gas grenade and a land mine. He parked his car in a different place, and after throwing the tear gas grenade through a hole in the door at Ada's Club he hid behind a concrete abutment and shot at close range Hardman, Plant and Simons as they ran out of the club. After that the defendant shot at several other people in the area, wounding two. He then hid his rifle, land mine and grenade cannister in a creek near his home, returned home and went to bed. He was awakened by

his brother and police officers about 6:30 a.m. Before the shootings the defendant had kept the ammunition, the land mine and tear gas grenade hidden under the sink in his home. It was during the period between the time he left Ada's Club shortly after 3 a.m. and 6:30 a.m. that the defendant, according to his testimony, did not remember what he did, except, as stated by him, he remembered lying in the grass at the high school and seeing artillery firing. After being taken to the office of the justice of the peace he apparently acted disturbed and soon thereafter was placed in jail. The jailer stated he acted normal except when his attorney visited him.

As previously mentioned, the evidence of the two psychiatrists was in conflict. The psychiatrist employed by the defendant's family stated he was a schizophrenic paranoid while the psychiatrist who testified on behalf of the state testified that he was not a schizophrenic paranoid. The jury, after hearing all of the evidence with regard to the issue of the defendant's insanity and his testimony that he did not remember what happened during the period the crimes were committed, apparently did not believe him and found from the lay and medical evidence that he was not insane and returned its verdict of guilty with a recommendation for mercy.

Instruction number 18A offered by the defendant and given by the court, which has heretofore been discussed, was a proper instruction to be used under the facts and circumstances in the case at bar. Then, too, instruction 18A was offered by the defendant and therefore he is not in a position to object to this instruction and contend that it was error for the court to give it.

It is appropriate to state here for the guidance of trial courts in this state that the M'Naghten Rule has been justifiably criticized by many courts, as has the Durham Rule and the "irresistible impulse" test. We, therefore, suggest a rule or test to be used in this state in future criminal trials involving a plea of insanity which would allow an appropriate balance between cognition and

volition to guide the trial courts in their instructions to the jury. We do not adopt any rigid language for the trial courts to use in instructing or charging the jury in such cases, but simply recommend that they adopt an approach based on the Model Penal Code referred to herein and dispense with the more limited test of right and wrong followed in the M'Naghten Rule. We would approve of an instruction to the effect that an accused is not responsible for his act if, at the time of the commission of the act, it was the result of a mental disease or defect causing the accused to lack the capacity either to appreciate the wrongfulness of his act, or to conform his act to the requirements of the law. The scope and extent of the instruction in a case will be governed by the evidence in the case. This, we believe, would be in keeping with the modern thinking of both the medical and legal professions with regard to the problem in cases involving the question of the insanity of the accused.

For the reasons stated in this opinion, the judgment of the Circuit Court of Wood County is affirmed.

*Judgment affirmed.*