328 S.E.2d 191

**STATE of West Virginia,**

v.

**Raymond SAMPLES.**

**No. 16253.**

Supreme Court of Appeals of West Virginia.

March 22, 1985.

Hugh Rogers, Jr., Kerens, for appellant.

Catherine A. McMullen, Asst. Atty. Gen., Charleston, for appellee.

## BROTHERTON, Justice:

On July 7, 1981, the appellant, Raymond Samples, was at his home with his parents and some of his brothers and sisters on Conley Run, near Valley Head, West Virginia. His step-brother, Bill Hamrick, and Bill's wife, Kathleen, were visiting from Wheeling. Testimony from other members of the family indicated that there was nothing unusual about the morning. Raymond "acted just like he always did. He was just sitting around talking to himself and laughing." "He just sat around just like always, you know, and acted just strange like always, you know."

There was no argument or confrontation that morning. Raymond and Bill Hamrick had a good relationship. They went hunting and fishing together several times. Members of the family testified at the trial that the two never argued. Therefore, no one was upset when Raymond left around noon carrying a high powered rifle, as they assumed he was going hunting. Unfortunately, he had a different plan in mind.

Sometime after Raymond left, William and Kathleen Hamrick and Harold Samples (Raymond's brother) left the house in the Hamricks' car. Kathleen Hamrick was driving and her husband was sitting in the front passenger seat while Harold Samples was in the back seat. As the car was crossing a bridge adjacent to the Samples' residence, a bullet was fired through the windshield of the car, but missed the occupants. Kathleen Hamrick stopped the car and William Hamrick got out to see what was going on. A second shot was fired which struck Kathleen Hamrick in the head, killing her instantly. More shots were fired, striking William Hamrick in the left leg, the right arm, and chest, mortally wounding him. Harold Samples, during this time, hid, first on the floor of the car and later underneath the car for approximately ten to fifteen minutes. Harold then ran to the house for help.

Raymond did not return to the house until around ten o'clock that night and was then immediately arrested by state police and sheriff's deputies, who had been waiting for him. State Trooper T.D. McDaniels started to read Raymond his *Miranda*[1] rights, but Raymond interrupted him, saying "Cut the s__t, man. I killed them and I want to go to prison." McDaniels finished reading the *Miranda* card and Raymond was transported to the state police headquarters in Elkins. There Raymond gave a full confession to shooting Bill and Kathy Hamrick[2] and also confessed to taking a shot at his sister, Mary Arbogast, and to shooting Rick Arbogast two or three

---

1. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

2. Pertinent parts of the confession are set out below:

Q. Tell me about the shooting incident that occurred near your residence earlier today?
A. I just killed them. I didn't like them. I always did want to kill them.
Q. Why did you want to kill them?

months earlier.[3] Two attorneys were appointed to represent Raymond the next morning.

On July 10, 1981, Raymond was admitted to Weston State Hospital for eighteen days of psychiatric testing, after which he was discharged and returned to the Randolph County Jail. Shortly after arriving at the jail, Trooper McDaniels interviewed Raymond about his claim of shooting Rick Arbogast. Raymond's attorneys were not notified of this interview and Raymond was not read his *Miranda* rights. During this interview, Raymond told Trooper McDaniels that he was putting on an act for the doctors at Weston and that he was not crazy.

Despite a general order of discovery being in force in Randolph County, requiring the prosecutor to disclose to the defense any written or recorded statements and the substance of any oral statements made by the defendant, the State withheld this information from the appellant's lawyers. Instead, the case went to trial with Raymond's attorneys unaware of this damaging admission.

A. They just keep on and on.
....
Q. Were you waiting on them to go through?
A. Oh, hell yes! I waited on them for about one hour or maybe two hours.
....
Q. Did you shoot at anybody else?
A. I took a shot at my sister, Mary Arbogast, but I missed.
....
Q. Were you under the influence of drugs or alcohol when this happened?
A. No. I ain't had no good dope in a long time.
Q. Did you know what you were doing?
A. Oh, hell yes.
Q. Why did you want to kill Bill and Harold?
A. I just wanted to, I reckon.
Q. Why did you shoot at your sister, Mary Ann?
A. I felt like it.
Q. Had they been hassling you any?
A. No.
Q. Did you shoot at Mary Ann while she was at the house?
A. Yes.
Q. That was before you shot at the other people, is that right?
A. Yes.
Q. Have you shot anybody else before today?
A. Yes. Rick Arbogast.
Q. When did this happen?

At trial, no pretext was made that Raymond did not kill the Hamricks. The only defense was insanity. The State put on its case and rested. The defense then put on several witnesses in its attempt to show Raymond's insanity. At the end of its case the defense rested and the State had a single rebuttal witness, Trooper McDaniels. The following is an excerpt from Trooper McDaniels' short rebuttal testimony:

Q. Did he say anything else with relation to his conduct at Weston with the relation to the doctors?
A. Yes, sir, he did.
Q. And what was that, sir?
A. He stated that he was putting on an act, that he was conning them and that he was not crazy and knew what he was doing.
Q. Are those his exact words the best you can remember them?
A. The best I can recall them.
Q. That he was not crazy, that he was putting on an act, and what else was it, sir?
A. That he knew what he was doing.

A. I'll be damned if I could tell you now. Maybe two or three months ago.
Q. Did you kill him?
A. I thought I did. He was in his car going up past my house. I was in front of the gray car at my house.
Q. Why did you want to shoot him?
A. Because I wanted to kill Randall Wood. He was driving the car.
Q. How do you know you shot Rick Arbogast?
A. I jumped up and seen blood through the scope.
Q. Where did the car go after you shot?
A. I don't know. It went on up the road. I never did see it no more.
Q. Did you hear later that Rick Arbogast got shot?
A. Yeah.
Q. Why did you want to shoot Randall Wood?
A. He was always saying shit about me.
Q. How long had you planned on killing Bill Hamrick?
A. A long time.
Q. Do you feel any remorse for killing the two people?
A. No, not at all.

3. Shooting Rick Arbogast apparently was a delusion. He was found alive, uninjured and ignorant of any shots being fired at him.

Q. And did he indicate to you that he was attempting to fool these doctors?

A. Yes, sir.

(Record at page 1002.)

The jury, not surprisingly, found Raymond Samples guilty of murder in the first degree with no recommendation of mercy. A motion for new trial was denied on April 16, 1982. This appeal was granted on March 27, 1984.

Raymond Samples appeals to this Court with two principal assignments of error: (1) That no *Miranda* warnings were read to him on the second interrogation; and (2) that the State should have disclosed the interview to the defense. We hold that the admission of Trooper McDaniels' testimony was reversible error for the reasons outlined below.

### I.

When Raymond Samples was interviewed by Trooper McDaniels for the second time, after his return from Weston State Hospital, Raymond's attorneys were not notified of the interrogation. The State argues that the reason for this was that Trooper McDaniels was not questioning Raymond about the Hamrick killings for which the attorneys were appointed, but was instead gathering information on the unrelated crime of shooting at Rick Arbogast. The State is correct in its assertion that obtaining counsel on an unrelated charge has no particular bearing on whether the defendant is willing to waive counsel on a separate charge. *See State v. Clawson,* 165 W.Va. 588, 270 S.E.2d 659, 669 (1980). However, the State must give the defendant his *Miranda* warnings so that he can make an informed decision whether to have counsel on the separate charge. *Id.* Raymond was not read his *Miranda* rights before the interrogation and cannot be said to have knowingly and intelligently waived counsel. Therefore, it was error to admit Raymond's statements about feigning insanity for the doctors at Weston.

### II.

This was not the only error in this case. The State also failed to disclose the second interview with Trooper McDaniels to the defense despite a general order of discovery. When the trial court grants a pretrial discovery motion requiring the prosecution to disclose evidence in its possession, nondisclosure by prosecution is fatal to the State's case where such nondisclosure is prejudicial. *See State v. Grimm,* 165 W.Va. 547, 270 S.E.2d 173, 178 (1980). It would be very difficult to argue that there was no prejudice in this case. Raymond Samples' only defense was insanity. A statement that he was putting on an act and that he was not really crazy was as damaging as any conceivable admission. The surprise use of the report prejudiced the appellant's preparation for trial and constitutes reversible error.[4]

For the reasons expressed herein, we reverse the opinion of the trial court and remand the case for a new trial.

Reversed and remanded.

---

4. Where a senseless, brutal killing has been committed, a sense of justice demands that the killer be punished, and one who comes before this Court, having killed with no legal excuse, for selfish motive and gain, can expect justice to be harsh. However, killings are not always willful, purposeful acts. Sometimes the killing is the result of a mental disease or defect where the killer lacks the capacity either to appreciate the wrongfulness of his actions or to conform his conduct to the requirements of the law. Our laws will not punish such a person for his actions. *See State v. Grimm,* 156 W.Va. 615, 632, 195 S.E.2d 637, 647 (1973), *overruled on other grounds State v. Nuckolls,* 166 W.Va. 259, 273 S.E.2d 87, 90–91 (1980). Punishing a person who doesn't understand what he is doing or can't control his actions would take us back to the time when the mentally ill were randomly incarcerated or tortured with demonic witch cures. It would be a cruel and senseless act, comparable with kicking a dog for disobeying a written command. Those suffering from mental illnesses have a right to be treated and not punished. For this right to be meaningful, the criminal defendant must have a fair opportunity to present evidence of his insanity at trial and to rebut any evidence which would tend to prove his sanity. Raymond Samples was not given this opportunity. The secret confession and surprise testimony unfairly prejudiced Raymond Samples in his attempt to show his insanity.