# CHARLESTON.

## STATE *v.* HATFIELD.

### Decided December 15, 1900.

1. JURY—*Qualifications.*

The object of the law is, in all cases in which juries are impaneled to try the issue, to secure men for that responsible duty whose minds are wholly free from bias or prejudice either for or against the accused, or for or against either party in civil cases. (pp. 563, 564).

48 561
49 667
49 690

48 561
53 612

48 561
59 199

48 561
65 83
165 376

48 561
f66 126

2. RELATIONSHIP—*Not Error to Exclude Juror.*

It is not error to exclude a juror from the panel in a felony case because of relationship between the juror and the prisoner, whether such relationship is by blood or marriage. (p. 564).

3. JUROR—*Not Error to Exclude from Panel.*

A juror who said the talk he had had about the case had made an impression on his mind as to the guilt or innocence of the prisoner, and he was still of the same opinion as to such guilt or innocence, and was asked, "Do you feel tnat you could sit here as a sworn juror and decide the case according to the evidence adduced in open court, absolutely disregarding what you may have heard?" answered, "I possibly might, if the evidence was entirely different from what I have heard." *Held* not error to excuse him from the panel. (p. 564).

4. WITNESS—*Qualification.*

A person convicted of felony and sentenced therefor, except it be for perjury, may, by leave of the court, be examined as a witness in any criminal prosecution, though he has not been pardoned or punished therefor. (p. 567).

5. CROSS-EXAMINATION—*Improper Evidence.*

A party has no right to cross-examine any witness, except as to facts and circumstances connected with the matters stated in his direct examination. If he wishes to examine him on other matters, he must do so by making the witness his own, and calling him as such in the subsequent progress of the cause. A party cannot by his own omission to take an objection to the admission of improper evidence, brought out on a cross-examination, found a right to introduce testimony in chief to rebut it or explain it. (pp. 569, 570).

6. HOMICIDE—*Self-Defense.*

Where a homicide is proven, by the use of a deadly weapon, and the plea of self-defense is relied upon, the burden of proving such defense rests upon the prisoner; and, to avail him, the facts and circumstances showing such defense must be established by a preponderance of the evidence. (p. 571).

7. TRIAL FOR MURDER—*Justifiable Killing.*

On a trial for murder, the necessity relied on to justify the killing must not arise out of the prisoner's own misconduct. (pp. 574, 575).

Error to Circuit Court, Mingo County.

Elias Hatfield, Jr., was convicted of murder in the second degree, and brings error.

*Affirmed.*

E. W. WILSON and H. K. SHUMATE, for plaintiff in error.

Edgar P. Rucker, Atty. Gen., and L. C. Anderson, for the State.

McWhorter, President:

Elias Hatfield was indicted in the circuit court of Mingo County for the murder of H. E. Ellis on the first day of June, 1899, and was convicted by the verdict of a jury of murder in the second degree, and sentenced to a term of twelve years in the penitentiary. The prisoner obtained from this Court a writ of error, and says the court erred in empaneling the jury "in this, that after selecting a panel of twenty jurors free from ex ception, the court proceeded and had examined eight other jurymen free from charge, and refused to permit the twenty jurors first selected to be empaneled." As set out in bill of exceptions No. 1 it appears that twenty jurors were drawn from those in attendance on the court, and being sworn on their *voir dire,* Berry Staton, one of the jurors said, "My sister married in the Hatfield family, and my mother is a little related to Anderson Hatfield's wife, but I don't know what it is." Could not tell his own relationship to the prisoner, was told to stand aside for the present, to which defendant excepted, which exception was overruled, and the court proceeded to select and empanel other jurymen, to which defendant also excepted. Thomas J. Farley, another of said panel, said he was related to Elias Hatfield, Jr., by marriage, that juror's wife and Hatfield's mother were second cousins, said to be, was told to stand aside for the present, and same ruling and exceptions as in case of Staton. A. B. Spratt, another of said jurors, said he was no blood relation to prisoner, but he married through the Justice stock, and it might be that he was a connection of the Hatfields, don't know what connection, might be second or third or fourth cousin by his wife through the Justice and Berry stock connection; that his mind was not free, had recognized his relationship with Anderson Hatfield, the father of the prisoner and the family ever since witness was married, was told to stand aside, same exception. James Farley, another of said jurors, was no blood relation of the Hatfields, but his sister married a brother of Mrs. Hatfield, the mother of the prisoner. He was told to stand aside for the present, and same exceptions. William Davis, another juror, was no relative of prisoner that he knew of, thought

he was related by marriage to deceased, H. E. Ellis; had formed an opinion as to the guilt or innocense of the prisoner, and did not think that he could sit as a sworn juror and decide the case according to the evidence adduced in open court, absolutely disregarding the opinion that he had, putting that out of his mind, was told to stand aside, for the present, same exceptions. L. C. Carnes, another juror, said the talk that he had had about the case had made an impression on his mind as to the guilt or innocence of the prisoner, it made an impression on him, and he was still of the same opinion as to his guilt or innocence. In answer to the question: "Do you feel that you could sit here as a sworn juror and decide the case according to the evidence adduced in open court, absolutely disregarding what you may have heard?" A. "I possibly might, if the evidence were entirely different from what I have heard," was told to stand aside for the present, same objection and exception. James Dempsey, another juror, had been told that he was related to the prisoner, but did not know what it was, that if he was related at all, it was blood relationship through the Vances, and had also been told that he was not related, said he was afflicted, had been shot and had to use morphine, had used morphine that day and the day before, sometimes suffered a great deal of pain, and when there was too much pain he generally used morphine, didn't know whether or not he would be physically able to serve on the jury that was liable to be kept in confinement several days, might be. The court directed said Dempsey to stand aside, and refused to swear him as one of the jurymen in the case. Exception taken by prisoner. Guy White, another of said jurors, said his mind was unbiased for or against the prisoner, had never made up or expressed an opinion as to the guilt or innocence of prisoner, was asked if since he had been summoned as a juror in this case any one had asked him to remain upon this case because he could give Elias Hatfield a fair trial, said he believed not, was then asked if he was acquainted with 'Squire M. Z. White, answered, yes, his father and M. Z. White are first cousins, said a few days ago 'Squire M. Z. White advised him not to cut himself off of the jury, did not know why he so advised him. When asked to use his exact language, he answered, "He said, 'Do not cut yourself off of the jury; I believe you can give Hatfield a fair and impartial trial.'" Did not remember the conversation until his attention was called to it, and was asked, "Do you now

remember that you told other people about 'Squire M. Z. White trying to get you on tnat jury?" A. "Yes, sir." Q. "Do you remember now who you told that to?" A. "No, sir. I do not remember who I told." Q. "You remember, however, that you were appealed to by 'Squire M. Z. White, and advised by him to not cut yourself off the jury, because you could give Hatfield a fair and impartial trial?" A. "Yes, sir." Said he understood from 'Squire M. Z. White that he wanted a man on the jury that would give Elias Hatfield a fair and impartial trial. The conversation was since the commencement of that term of the court, and did not come to his mind until called to his attention. He did not know that M. Z. White knew he had been summoned on tha jury, but he knew that he had been drawn on the jury. The court directed the juror to stand aside for the present, but to remain in the court room. The prisoner by counsel excepted. And the panel was made up of twenty jurors without the eight so stood aside. The prisoner by counsel then moved to quash the said panel because the jurymen aforesaid who were told to stand aside, were not again called as part of said panel, and others selected instead, which motion the court overruled, and defendant excepted. The object of the law is, in all criminal cases and indeed in all cases in which juries are empaneled, to try the issue, to secure men for that responsible duty whose minds are wholly free from bias or prejudice either for or against the accused, because of the difficulty in obtaining such a panel, in particular cases, on account of the condition of the public mind in the community where an atrocious crime has been committed, and so careful is it that the accused shall have a fair and impartial trial that the law provides for a change of venue to a locality more remote from the scene in order that a jury can be had who may not be subject to the undue influence of the excited public mind, and while it is right that the interests of the prisoner should be protected to the extent of insuring to him a fair and impartial trial, it is no less important that the interests of society should be protected by the courts in so far as to see that no man finds his way into the jury box who is in any wise related to the accused either by blood or marriage ties to a degree that could influence his mind to prevent an unbiased verdict. It is an old saying that "blood is thicker than water." To secure a jury which will insure such verdict is just, and alike fair to the State and the accused, and in securing this

result the purpose of the law is accomplished. The jurors Berry Staton, Thomas J. Farley, A. B. Spratt and James Farley, while these jurors were in a greater or less degree related to the prisoner, they manifested no delicacy in the matter, and instead of asking to be excused on account of relationship even though it might be remote, underwent such examination as would lead one to believe that they really desired to serve as jurors in the case. The court did not err in excluding them from the panel. L. C. Carnes had formed an opinion in the matter, so that he did not feel like risking himself, was not sure that he could render an unbiased verdict, but POSSIBLY might, if the evidence were entirely different from what he had heard it. William Davis had formed an opinion which seemed to be a very decided one, and one which he did not know that he could disregard or put out of his mind on the trial. Guy White had been advised by his relative, 'Squire M. Z. White, not to cut himself off of the jury because he could give Hatfield a fair and impartial trial, and he in his examination on his *voir dire* manifested quite a desire to be retained on the panel. What his object or purpose was in remaining on the panel may be a matter of surmise. James Dempsey on his examination showed himself physically unfit to serve, and it may be very seriously questioned whether he was mentally qualified. He evidently had that habit at least to an injurious extent which is beginning to rival the habit of the use of intoxicating liquors, and much more destructive of the mental faculties. I mean the morphine habit. The court seems to have succeeded in carrying out the purpose of the law, viz: the impaneling of an unobjectionable jury, as there is no complaint of a single member of the jury as finally constituted. Defendant's counsel say that the court erred in admitting improper evidence to go to the jury on the part of the State, and rejecting proper evidence offered by defendant, as set out in bill of exceptions No. 3. John L. Browning, a witness for the State, was asked: "Have you ever told anybody that you heard this prisoner say anything about (Doc.) Ellis? Did you ever tell anybody that you heard Elias Hatfield a short time before, a while before H. Ellis was killed, say anything about H. E. Ellis?" Ans. "I suppose I have." Q. "Who did you tell?" A. "I might have told Squire Hatfield and his brother." Q. "Have you not told Mr. Browning, since you have been in this town, that you would not get upon the witness stand and tell what

you knew in this case for one hundred dollars?" A. "Not that I recollect of." Q. "Have you not made that statement to Squire Mitch. Hatfield, James Hatfield, and deputy sheriff Bill Johnson, who served you with the attachment in this case, that you would not come upon this witness stand if you could get out of it, and tell what you knew against Elias Hatfield for one hundred dollars?" A. "If I have I do not recollect it." Q. "Did you not tell us (meaning attorneys for State). Did you not tell us that you were in that saloon on that occasion with Elias Hatfield, and he told you that if Doc. Ellis fooled with him he would kill him?" A. "No, sir, I do not think I did." This witness had been asked by the attorney for the State whether or not some two or three weeks before the death of Ellis, when he was over at the place where Hatfield was, if he had heard Elias Hatfield say anything about Doc. Ellis or H. E. Ellis, answered did not think he had, was then asked if at any time he had ever heard the prisoner say anything about Doc. Ellis at any time before his death, and he answered, not that he remembered of. He was asked if he had ever told anybody that he had heard Elias Hatfield a short time before, awhile before H. E. Ellis was killed, say anything about H. E. Ellis, he answered, "I suppose I have." Then followed the questions objected to. This witness stated that he was related to the Hatfields, and was evidently a very unwilling witness. He was asked why he was shaking and trembling so. He answered, "I might have been talking a little too much. I think you fellows are trying to make me swear what I talked." Q. by the court: "Do you mean to say that you have stated something to counsel differently than what you are willing to swear?" He answered, "Yes, sir." The prosecution had been deceived into offering the evidence of this witness by his own talk as to what he knew about the matter in issue, and they had a right to ask the questions that it might be known to the jury that he was introduced by them in good faith, and the evidence given by him did not prejudice the prisoner. The State introduced as a witness James Harvey Fee, counsel for the prisoner objected to the testimony of Fee on the "grounds that a man convicted of murder in the first degree should not be permitted to give evidence." The court overruled the motion and prisoner excepted. Section 17, chapter 152, Code, provides that "A person convicted of felony and sentenced therefor, except it be for perjury, may by leave

of the court, be examined as a witness in any criminal prosecution, though he has not been pardoned or punished therefor." Witness said he heard Elias Hatfield threaten Doc. Ellis, across the river at Bob. Hatfield's boat, it was a boat they sold whiskey from, and Elias said, "Doc. Ellis had just as well be in hell as to kidnap his brother and take him across the line. He said he would kill him if it took him ten years." Witness was then asked, "Tell the jury whether or not any one of the Hatfields— Bob. Hatfield or Anderson Hatfield, known as 'Anse.,' ever offered to hire you to kill Doc. Ellis." To which question prisoner objected, objection overruled and exception. Ans. "Bob. Hatfield offered me one hundred dollars to kill Doc. Ellis once; that is all I know about it," and stated it was on the road to Logan, there were several along. "Elias was by but I don't know that he was close enough to hear it all." The prisoner should not be affected by threats made by his father or brother ordinarily; but according to the evidence of this witness, they were together, and seemed to have a common purpose. When Elias Hatfield threatened Doc. Ellis, and said he had just as well be in hell as to kidnap his brother and take him across the line, it was at the whiskey boat of his brother Bob. Hatfield, and when Bob. made the threat Elias was present. Witness further states, and this without objection, that after they got to Logan Court House, where they were going to the trial of Cap. Hatfield for the killing of a man, Bob. Hatfield had a couple of No. 38 Smith and Wesson pistols, gave witness one and said for him to stay with him and watch Doc. Ellis. When Elias Hatfield was on the witness stand he did not deny that he was present when his brother Bob. Hatfield made the offer or that he heard it. Under the circumstances of 'the case, the evidence of the offer of Bob. Hatfield was admissible. Lark Smith, another witness was introduced for the State, and was asked about a conversation (about the time that Johnse Hatfield was said to have been taken to Kentucky) if such he had, with Anderson Hatfield, in relation to that fact and about Doc. Ellis, and where they had the conversation, answered he had a conversation with Anderson Hatfield and his son Bob. Hatfield, at place near Wharnecliff. "State whether after having this conversation you warned Doc. Ellis that he was in danger," answered that he did. To the question and answer prisoner objected, the objection was overruled, and the court permitted the same to go to the jury for the

purpose *only* of showing what motive H. E. Ellis had for carrying a Winchester rifle after hearing of said threats. For such restricted purpose such evidence was competent to go to the jury.

On cross-examination of witness George Christian by the defense, in referring to the examination made of the body of Ellis after he was killed, witness was asked the following questions: "When he probed for it (meaning the ball) where did he say he thought it had come out, of the shoulder, or from which shot?" and "Did he say when he made the examination which wound in the shoulder or neck that ball came from?" To the asking of each of said questions the State by her attorney objected, and the objection was sustained, and would not permit them to be answered, and defendant excepted. The object I presume in asking these questions was in some measure to contradict Dr. Ellis about the presence of the ball at the time he made the examination of the body, which was wholly immaterial, and the permission to answer the questions would not strengthen the defense nor the refusal prejudice it.

On cross-examination of the State's witness Wayne McDonald, on objection of State, the court refused to allow the witness after stating that he saw Ellis' gun after he was shot, and did not know whether Ellis shot or not, that he could make no distinction between the shots, "After this occurred did you make statements at Wharnecliff or at Gray to some people there that you could have stopped Ellis from going out with his gun if you had known what was going to happen?" In the absence of any explanation of the object of the answer to the question showing the materiality of it, the presumption is that the court did not err in sustaining the objection on the ground of its immateriality. The defendant introduced as a witness W. R. Martin, yard clerk, who having stated that after the killing of Ellis he had taken the gun that was brought into his office and opened it and threw an empty shell out of the chamber, and could not get it back until he unloaded the magazine, then put the shell back into the chamber, and the loaded ones in magazine, not having the shell present in court witness was trying to describe the shell when defendant's attorney handed witness a shell and asked him, "Anything like that?" Witness answered, "It was on that make, but not so large." "Pass that around to the jury," to which the attorney for the State objected, and the

objection was sustained. Defendant excepted. It was not claimed that the shell thus produced was a shell that was ever used in that gun. Witness says it was larger. It could have only been shown to the jury by consent. On demand of defendant's counsel the gun of Ellis was produced in court and exhibited to the jury.

The prisoner then introduced as a witness R. W. Buskirk. When it came to the cross-examination of this witness, the prisoner by counsel objected to the State cross-examining the witness on matters not brought out in the examination in chief, and contend that the cross-examination should be confined to the evidence that was brought out on examination in chief. The rule as laid down in *Railroad Co.* v. *Stimpson,* 14 Peters (U. S.) 448, it is said in the opinion by Justice Story, "upon the broad principle, now well established, although sometimes lost sight of in our loose practice at trials, that a party has no right to cross-examine any witness except as to facts and circumstances connected with the matters stated in his direct examination. If he wishes to examine him as to other matters, he must do so by making the witness his own, and calling him, as such, in the subsequent progress of the cause. The question then is presented whether a party can by his own omission to take an objection to the admission of improper evidence brought out on a cross-examination, found a right to introduce testimony in chief to rebut it or explain it." It is stated by the court in the bill of exceptions, "However, this is the first time this question has been raised during the trial of this case, and the parties having cross-examined each other's witnesses with reference not only to matters stated in direct examination, but as to all matters relied upon by the State or by the defense, I think it would hardly be fair at this stage of the game to sustain the objection and confine the cross-examination by the State's attorneys to the matters stated in the direct examination of the witness Buskirk—that is, now for the first time to apply the rule laid down by the United States Supreme Court. Therefore, the objection is overruled, but the cross-examination shall be confined within reasonable limits to the matters brought out in the examination in chief." It would seem by common consent a rule had been adopted in the trial of the case which had prevailed up to the closing moments of the trial, a rule which prevails in many courts, and owing to "our loose practice at trials" obtains

in many of the circuit courts of this State. While the rule as laid down by Justice Story and the Supreme Court should be strictly followed, I think the trial judge exercised a sound dis-. cretion under the circumstances of this case in overruling the objection. As set out in bill of exceptions No. 2, the State asked the following instructions, to each of which defendant objected, the court overruled the objections and gave the instructions, and defendant excepted

1. "The court instructs the jury that a man is presumed to intend that which he does or which is the immediate or necessary consequence of his own act, and if the prisoner, Elias Hatfield, Jr., with a deadly weapon in his possession, without any or upon very slight provocation, gave the deceased, H. E. Ellis, a mortal wound, he, the prisoner, is *prima facie* guilty of wilful, deliberate and premeditated killing, and the necessity rests upon him of showing extenuating circumstances and unless he proves such extenuating circumstances, or the circumstances appear from the case made by the State, is guilty of murder in the first degree."

2. "The court instructs the jury that where a homicide is proven by the use of a deadly weapon, and the plea of self-defense is relied upon, the burden of proving such defense rests upon the prisoner, and to avail him, the facts and circumstances showing such defense must be established by a preponderance of the evidence."

3. "The court further instructs the jury that if they believe from the evidence in this case, beyond a reasonable doubt, that the prisoner, Elias Hatfield, Jr., armed with a Winchester rifle approached the deceased, H. E. Ellis, while he was peaceably standing upon the steps of the railroad car, in such a manner as to give the deceased, H. E. Ellis, reasonable cause and ground to apprehend a design on the part of the prisoner to do him some great bodily injury, or to kill him, and reasonable cause to believe and apprehend that there was imminent danger of such design being accomplished, and if the jury believe that the said H. E. Ellis did then and there have such apprehension and belief, then the deceased, H. E. Ellis, had then and there a right to procure a gun, shoot at and even to kill the prisoner in order to save his own life, cr to protect himself from great bodily harm at the hands of the prisoner, and if the prisoner, Elias Hatfield, Jr., under such circumstances killed the deaceased he

cannot be acquitted upon the plea of self-defense, but of all such facts and circumstances the jury are to judge from all the evidence before them."

4. "The court instructs the jury that if they believe from the evidence in this case, beyond a reasonable doubt, that the prisoner, Elias Hatfield, Jr., armed with a Winchester rifle, sought the deceased, H. E. Ellis, with the view of provoking a difficulty with him, or with the intent of having an affray with him, for the purpose of killing him, and a difficulty did ensue, he cannot, without some proof of a voluntary change of conduct or action on his part, excuse the killing of the deceased, H. E. Ellis, upon the ground that the deceased, H. E. Ellis, fired the first shot, for the law will not hold him guiltless, who by seeking a combat and continuing therein, brings upon himself the necessity of killing his fellowman, upon the principle that one cannot knowingly and wrongfully bring upon himself the very necessity which he sets up for his defense."

5. "If the jury believe from the evidence before them that Elias Hatfield, Jr., the prisoner, armed with a Winchester rifle, on the 3d day of July, 1899, at Gray yards, in Mingo County, approached the deceased, H. E. Ellis, without fault on the part of Ellis, and then and there applied to said Ellis epithets and insulting language, he, said Hatfield, intending then and there, before and at the time of approaching said Ellis and applying to him such epithets and insulting language, and by his manner indicating to said H. E. Ellis if he, said Ellis, resented by any overt act such epithets and insulting language, to instantly 'kill said Ellis or to inflict upon him great bodily harm, and that while using such epithets and insulting language a bystander pushed or led away said Hatfield involuntarily on the part of Hatfield and against his will to a distance of twenty or thirty feet from the place where the said Hatfield had commenced the use of such epithets and insulting language, and that said Hatfield while so being led away still continued to have such intention and killed the said Ellis while making an overt act toward the prisoner, indicating to said prisoner an intention to shoot the prisoner or to inflict upon him great bodily harm, then the prisoner cannot rely upon self-defense as a justification for the killing of the said Ellis."

6. "The court instructs the jury that after they shall have compared and considered all the evidence in the case if they

have a reasonable doubt as to the guilt of the prisoner, Elias
Hatfield, Jr., as charged in the indictment, they cannot con-
vict; that by reasonable doubt is meant such doubts, based upon
the evidence, as they may honestly and reasonably entertain as
to any material fact essential to prove the crime charged. It
must not be an arbitrary doubt, without evidence to sustain it,
but must be serious and substantial in its nature, in order to
warrant an acquittal and one which men may honestly and con-.
scientiously entertain."

7. "The court further instructs the jury that if they find the
prisoner guilty as charged in the indictment, they shall further
find whether he is guilty of murder in the first or second degree.
If they find him guilty of murder in the first degree, they may
in their discretion further find that he (the prisoner) be pun-
ished by confinement in the penitentiary; and if such further
finding be not added to such verdict, the judgment thereupon
rendered by the court will be that the prisoner be punished with
death, and if such further finding is added, the judgment there-
upon rendered by the court will be that the prisoner be con-
fined in the penitentiary during his life. If they (the jury) find
the prisoner guilty of murder in. the second degree, as charged
in the indictment, the punishment imposed upon the prisoner
will be confinement in the penitentiary not less than five nor
more than eighteen years."

The State's first instruction is identical with syl. 11, *State
v. Cain,* 20 W. Va. 679; the seventh is the same that was ap-
proved in *Staley's Case,* 45 W. Va. 792 (797), and the other
five propound the law correctly, under the evidence in this case.

The prisoner by counsel asked the court to give nineteen sev-
eral instructions to the jury, of which four were given as asked,
and two were amended by the court and given. To the action of
the court in refusing the instructions prisoner excepted, as well
as to the action of the court in amending and giving in its own
way the said two instructions. The only reference to the in-
structions in the brief of the defendant is after giving a short
synopsis of the evidence from his standpoint says: "Under
this state of facts the court below allowed the State's instruc-
tions on the theory that the defendant had sought and com-
menced a malicious assault and combat, and went still further,
even had that been so; and at the same time deprived the de-
fendant of the principles of self-defense, as plainly laid down

by all the courts of the United States, and especially the Court of Appeals of this State, by refusing and changing defendant's instructions.

"There was but a quarrel and insulting words, by both parties, no combat—not a blow struck nor any movement, in that direction, by defendant, until after the quarrel had ended, and the defendant was moving away, and the deceased had procured his rifle and fired the first shot, when, and not until then, defendant, by a mere chance shot, fired the fatal shot, killed his assailant, and saved his own life. Four loaded cartridges were yet in the magazine of the dead man's rifle.

"Abusive words, however insulting, could not have justified the deceased in killing the defendant, and had he succeeded, it would have been a plain case of murder, or, at least manslaughter. Even had there been a combat, commenced by defendant, he had done all he could, or that was necessary, by withdrawing in good faith, to restore him to his right of self-defense. There, surely can be no law under such circumstances to have required defendant to stand still and be killed without an endeavor to save his own life."

In *State* v. *Neeley*, 20 Iowa 108, it is held that "When the defendant, on trial for murder, sought the deceased with a loaded gun, with the view of provoking a difficulty, or with the intent of having an affray, and a difficulty did ensue, he cannot, without some proof of a change of conduct or action, excuse the homicide on the ground that the deceased fired the first shot," and in *Vaiden* v. *Commonwealth*, 12 Grat. 717, (syl. pt. 3), it is said, "On a trial for murder, the necessity relied on to justify the killing must not arise out of the prisoner's own misconduct." That Hatfield provoked a quarrel with Ellis for the sole purpose of killing him, if he could succeed in having him resent his insults, there can be no question. He placed himself in a position that at the slightest movement on the part of Ellis like attempting to draw a weapon, Hatfield could have shot him in one second of time, and this Ellis could see and knew. Hatfield knew he could not with any safety from the law shoot him down unless he made some motion or show of resentment, therefore his purpose was to provoke him to do it, that he might have some pretext for carrying out his purpose. Hatfield did not voluntarily withdraw, but stood there in that threatening attitude until he was taken away by Mr. Parrill. It is claimed that

Hatfield made no assault on Ellis. The definition of assault is, "An unlawful attempt or offer, with force and violence to do a bodily injury to another," and, "An assault may be completed without touching the person of the one assaulted, as by lifting a cane, clinching the fist, or pointing a gun at him; but words alone, however abusive, cannot amount to an assault."

Standing in the position Hatfield did relative to that of Ellis, his gun pointed down with his hand on the lock and a part of the time at least the gun cocked, and which could be raised in position to shoot quite as quick as a flash of lightning, it was nothing short of a malicious assault on Ellis, yet defendant's counsel contend that it amounted to nothing but words. If Ellis had ever happened in an unguarded moment to put his hand toward his pocket, he would have been killed in a second of time, the gun could scarcely have been in a more threatening position if it had been pointed at his breast. What was defendant doing with his Winchester rifle in his hands? What legitimate use could he have had for it? He had gone to take some letters to the postoffice, surely a very peaceable mission. It was but a short distance from his place of business to the postoffice, and not through a hostile section infested with wild beasts, nor through jungles nor forests inhabited by robbers and brigands. It is singular that when men habitually "go a gunning," where there is no other game than their fellow men and find a victim, it is invariably one who is attempting to take the life of the hunter, and it is done in self-defense. It would seem that these reformers would have rid the country by this time of these dangerous characters, so that it would no longer be necessary to carry a Winchester constantly in self-defense when about the ordinary duties of life. The most of the instructions of the defendant are prepared on the theory that the parties had a mutual quarrel, both alike and equally at fault. Hatfield was not retiring willingly, and for the purpose of getting away from the trouble, and was perfectly prepared with his gun to shoot when the opportunity was afforded. In *Gillcland* v. *State,* 44 Texas 356, it is held: "If defendant engaged in a combat, knowing that it would result in the death or some serious bodily injury, which might produce the death of his adversary or himself, or by his own wrongful act brought about the necessity of taking life, he cannot plead that such killing was in his necessary self-defense, but the killing will be imputed to the malice expressed or im-

plied by reason of the wrongful act, which brought it about." In *Erwin* v. *State,* 29 O. St., at p. 200, Judge McIlvaine says: "It is true that all the authorities agree that the taking of life in defense of one's person, cannot be either justified or excused, except on the ground of necessity; and that such necessity must be imminent at the time; and they also agree that no man can avail himself of such necessity, if he brings it upon himself." Taking the case in all its bearings I can scarcely conceive how the jury could have found a verdict more favorable to the prisoner if the court had given all the instructions asked by the prisoner. The instruction asked for by the prisoner on the question of self-defense, and that is all the defense that is pretended to be made, is covered by the second instruction by the State. That being so, it was not error to refuse others on the same subject. *Brigham's Case,* 42 W. Va. 234, (syl. pt. 4). And instruction No. 6, given at the instance of the prosecuting attorney is fair to the prisoner, giving him the benefit of any reasonable doubt they might have of his guilt. Taking it all together, the prisoner had a fair trial by an impartial jury, and should not complain of the punishment imposed upon him by the judge under whose supervision the trial was had, and who heard all the testimony and thought the jury made no mistake. From some cause doubtless satisfactory to itself, the court did not inflict the heaviest penalty prescribed for murder in the second degree, tempering judgment with mercy, for which the prisoner should be grateful.

I see no reversible error in the judgment, and the same should be affirmed.

*Affirmed.*