STATE OF WEST VIRGINIA

*v.*

PARKER LEE PENDRY

(No. 13594)

Decided July 20, 1976.

*Hostler & Shinaberry, Sterl F. Shinaberry* for Parker Pendry.

*Chauncey H. Browning*, Attorney General, *Fredric J. George*, Assistant Attorney General, *Richard E. Hardison*, Deputy Attorney General, for the State.

WILSON, JUSTICE:

On appeal by Parker Lee Pendry from a jury verdict returned on November 20, 1972, in the then Intermediate Court of McDowell County finding Pendry guilty of murder in the second degree, we reverse and remand the case to the Circuit Court of McDowell County for a new trial.

Pendry assigns numerous errors which raise substantial questions regarding (1) the admissibility of certain medical testimony offered by the State in opposition to Pendry's defense of insanity; (2) the trial court's abuse of discretion in restricting the defendant's *voir dire* examination and refusing to excuse four jurors for cause upon motion of the defendant; and (3) instructions given on behalf of the State over the objection of the defendant and refused on behalf of the defendant upon objection by the State.

Although our reversal is predicated primarily upon errors committed in the giving of certain of the State's instructions, we will nonetheless consider all errors relied upon so that at a retrial of the case certain procedural and evidentiary problems may be forestalled.

On February 10, 1972, Pendry shot and killed his father-in-law, Cecil Hagerman.

The evidence indicated that Pendry and his wife had a long history of marital discord which Pendry attributed, at least in part, to interference by his in-laws in his domestic affairs.

On the night of the shooting when Pendry came home from work and found that his wife and children were not at home, he became distraught and made efforts to talk to his wife by telephone at the home of his father-in-law. When she refused to talk to him, he became more disturbed, took some shotgun shells from his own home, obtained a shotgun from his grandmother's home, proceeded to his father-in-law's home and endeavored to gain admission. The evidence shows that he was in an

extremely emotional state. Upon failing in that effort, he cut the screen on the living room window of the Hagerman residence, broke the glass in the window, pulled the curtains down, and fired, killing Cecil Hagerman and wounding Florence Hagerman, his mother-in-law.

Within about 45 minutes following the shooting, Pendry was arrested at the home of his father and was taken to State Police Headquarters where he was then interrogated, after which he signed a confession, the voluntariness of which is not contested in this appeal.

At the April, 1972 Term of the then Intermediate Court of McDowell County, petitioner was indicted for murder. Thereafter, upon motion, he was examined as to his sanity by Doctors Murry and Castrodale of McDowell County, neither of whom was a psychiatrist; was thereafter examined at Weston State Hospital; and was further examined at his own request by Dr. David Wayne, a Board certified psychiatrist.

Doctors Murry and Castrodale reported to the court that, assuming the history of skull fracture which Pendry gave was legitimate, their impression was that Pendry had a moderate degree of mental retardation with a compulsion complex and an associated post-traumatic epilepsy of the petit mal type. They recommended that he be evaluated to determine if he should be permitted to stand trial.

Upon being sent to Weston State Hospital, he was examined and psychiatrically evaluated over a period of time, and a report was made indicating that Pendry was capable of standing trial and assisting his lawyer in preparing his case.

Upon Pendry's plea of not guilty, the trial commenced on November 16, 1972. The principal thrust of the defense which was presented was (1) that the defendant was not guilty by reason of insanity; and (2) that at the time of the incident, Pendry was operating under extreme agitation and heat of passion caused by the cumu-

lative effect of the long-time interference by his in-laws in his domestic and marital relationship.

The psychiatric testimony on behalf of Pendry was that he was suffering from schizophrenia, chronic, undifferentiated type and that at the time of the shooting he did not know right from wrong and was psychotic.

In rebuttal, the State offered testimony by Dr. F. A. Salinquit, a staff physician at Weston State Hospital, and Dr. Adrian Villarin, Clinical Director of Weston State Hospital. Dr. Villarin testified to the effect that Pendry, at the time of the commission of the offense, knew right from wrong.

## I. *THE STATE'S MEDICAL TESTIMONY*

The defense urges on appeal that it was improper for the trial court to permit Doctors Salinquit and Villarin to testify from a staff report which contained, according to the defense, the opinions of others not called as witnesses; that no proper foundation was laid to permit the use of the report as a hospital record; and that Dr. Villarin's testimony was given in response to improper hypothetical questions, the answers to which asserted facts which were not in evidence.

We find no merit in any of these contentions.

The defense contends that the State offered no evidence establishing that the forensic staff notes from which Doctors Salinquit and Villarin testified were prepared in the course of their professional care or treatment of the defendant. The record does not sustain this argument. It appears that Dr. Salinquit saw Pendry, obtained a medical history from him and prepared a report regarding him. Dr. Villarin reviewed the report and personally examined Pendry. The evidence in the case makes it clear that the report which the doctors used in the courtroom was certainly one which was prepared at Weston State Hospital in the normal course of the examination of Pendry.

The defense asserts, in essence, that every person at Weston State Hospital who had anything to do with Pendry's examination, care or treatment would have to be independently produced as a witness before either Dr. Villarin or Dr. Salinquit could utilize the report in testifying as to any conclusions based in whole or in part on examination, tests, treatment, observations or conclusions of others.

This position is clearly not within the rule which we announced in *State v. Myers*, ____ W. Va. ____, 222 S.E.2d 300 (1976), and is not in accordance with the modern approach to the production of expert medical testimony.

For example, Rule 703 of the Federal Rules of Evidence, applicable both in criminal and civil cases, permits an expert to testify as to his opinion so long as the facts or data upon which he bases his opinion are of a type reasonably relied upon by experts in the particular field of his expertise. The notes of the Advisory Committee indicate that the purpose of the rule is to bring judicial practice into line with the practice of experts themselves when not in court. With specific reference to physicians, for example, the Advisory Committee points out that a physician in his own practice bases his diagnoses on many different sources of information, including statements made by patients and relatives, reports and opinions from nurses, technicians and other doctors, and upon x-ray and other records.

Illustrative of the rationale and legitimacy of expanding the utilization of hospital records and reports of tests and studies are *United States v. Partin*, 493 F.2d 750 (5th Cir. 1974); *Tarvestad v. United States*, 418 F.2d 1043 (8th Cir. 1969), *cert. denied*, 397 U.S. 935, 25 L.Ed.2d 116, (1970); *Smith v. United States*, 353 F.2d 838 (D.C. Cir. 1965), *cert. denied*, 384 U.S. 974, 16 L.Ed.2d 684, (1966); *Alexander v. United States*, 318 F.2d 274 (D.C. Cir. 1963); *People v. Ward*, 61 Ill. 2d 559, 338 N.E.2d 171 (1975); and *Smith v. State*, 259 Ind. 187, 285 N.E.2d 275

(1972), *cert. denied,* 409 U.S. 1129, 35 L.Ed.2d 261, (1973).

We adhere to the rule announced in *State v. Myers, supra,* regarding the utilization by an expert medical witness of records or documents whose reliability has been reasonably established and which have been kept in the regular course of professional care or treatment of the defendant and are of a type reasonably relied upon by experts in the witness' particular field of expertise. We believe such a rule is consistent with the progressive and logical trend of bringing judicial practice into line with the practice of experts themselves when not in court, thereby tending to make their testimony less artificial and more meaningful.

In this case, we do not consider the question of the admissibility of the records. The State made no effort to introduce the records as such. The doctors who were testifying had examined Pendry and merely used the staff report during the course of their testimony. It is abundantly clear that the opinions given in their testimony were their own opinions about which they could have been, and were, fully examined.

The defense further argues that an improper hypothetical question was propounded to Dr. Villarin which permitted him to make reference to information which the defense asserts was not otherwise in evidence. Here again, the record does not sustain the position taken by the defense. The specific question was not objected to by the defense. No motion was made to strike the answer until after both the State and the defense had rested their cases and after a weekend recess was taken. Apart from that fact, the specific question was one which asked Dr. Villarin the basis for his opinion that Pendry knew the difference between right and wrong. In giving his answer Dr. Villarin referred to circumstances in which Pendry, after the shooting, is said to have suggested that the law be called "so they can come and get me."

The question which was propounded was not a hypothetical question, and we can perceive no reason why the doctor should not have been permitted to state the basis of his opinion that the defendant at the time of the commission of the offense knew the difference between right and wrong. If the remark upon which the doctor relied was erroneous or inaccurate or otherwise assailable, those matters could have been elicited upon proper cross-examination and would bear on the weight of the doctor's testimony rather than upon its admissibility as such.

## II. VOIR DIRE

The defense contends that the trial court unduly restricted the *voir dire* examination of the defendant and erred in failing to remove four jurors for cause and denying Pendry's attorney an opportunity to interrogate the four jurors in chambers out of the presence of the other members of the panel.

If this were the only error relied upon, we would not consider it sufficiently substantial to warrant a reversal because the record as presented to us does not sufficiently establish an abuse of the court's discretion in connection with the *voir dire* examination and the refusal to remove the four jurors for cause. However, the trial court indicated a doubt that the separate questioning of jurors would be proper. That indicates to us that there may be some reservations by trial judges as to the full extent of their discretion regarding *voir dire* examination.

The West Virginia statute governing *voir dire* examination is one of the most progressive statutes found anywhere on the subject.[1] A reading of the statute

---

[1]*W. Va. Code*, 56-6-12, *as amended* provides as follows:

"Either party in any action or suit may, and the court shall on motion of such party, examine on oath any person who is called as a juror therein, to know whether he is a qualified juror, or is related to either party, or has any interest in the

clearly requires the court to provide for an adequate *voir dire* to the end that a juror be fully qualified, not related to either party, with no interest in the cause or sensible of any bias or prejudice. If a party believes that a juror is subject to a challenge for cause, he may even introduce evidence in support of his objection to the juror.

Our statute would forbid abusive, improper or pointless *voir dire*, but it guarantees that *voir dire* may fully probe a prospective juror's general qualifications, interest, bias or prejudice. A trial judge, in his discretion, has the authority to utilize any procedure, including examination of a prospective juror out of the presence of other jurors, if he believes that the impartiality of the jury may be better determined in that manner.

It is important for courts and litigants to recognize that the *voir dire* examination, if it is to serve its proper function, must of necessity be directed not only to establishing a basis of a challenge for cause, but also to enable a litigant and his counsel to exercise reasonable judgment in utilizing peremptory challenges.[2]

There should be no tendency exhibited by the trial court to make a meaningless ritual out of the *voir dire* process. Likewise, the trial court should not permit the integrity of the process to be subverted by protracted and pointless questioning or by any questioning which is calculated only to embarrass, humiliate, intimidate or

---

cause, or is sensible of any bias or prejudice therein; and the party objecting to the juror may introduce any other competent evidence in support of the objection; and it it shall appear to the court that such person is not a qualified juror or does not stand indifferent in the cause, another shall be called and placed in his stead for the trial of that cause. And in every case, unless it be otherwise specially provided by law, the plaintiff and defendant may each challenge four jurors peremptorily."

[2]For a discussion of the function of peremptory challenge, *see,* Babcock, *Voir Dire: Preserving "Its Wonderful Power,"* 27 Stan. L. Rev. 545 (1975); and *Note, Voir Dire: Establishing Minimum Standards to Facilitate the Exercise of Peremptory Challenges,* 27 Stan. L. Rev. 1493 (1975).

perhaps itself create prejudice on the part of prospective jurors.

The criticism most frequently voiced by those who would restrict *voir dire* examination is that it is time-consuming. It is true that the time of the court and all parties is important. However, the efficient utilization of time does not require any sacrifice of procedures which are calculated to assure that not only is a jury free from any taint which would justify a challenge for cause, but also that opportunity has been given to exercise peremptory challenges on an intelligent and meaningful basis.

It may not always be sufficient merely to ask a juror whether he is sensible of any bias or prejudice and to accept either his denial or claim of bias or prejudice merely because he says it. The existence of bias or prejudice or other lack of qualification is addressed in the first instance to the trial court. Although the juror's opinion is entitled to consideration, it need not always be taken to be conclusive. It may frequently become necessary for the trial court or counsel to go into particular matters which may be the subject of biased or prejudiced views in order to determine whether the juror in fact, even without his own knowledge, may have a demonstrable bias or prejudice which would operate to the disadvantage of one of the litigating parties.

This kind of inquiry cannot always be made in the presence of all the jurors. For example, some inquiries may call for a juror to disclose information which might prove embarrassing if required to be given in open court. Also, information which may be revealed may serve to taint an entire panel if given in the presence of the entire panel. Consequently, the trial court must exercise judgment regarding the possible nature of legitimate inquiries in order to determine when there is a need to pursue them out of the hearing of other prospective jurors.

In this case, after first unsuccessfully challenging four jurors for cause and moving that they be disqualified

and discharged, the defense asked leave of court to question each of the four jurors in chambers or out of the presence of the remaining jurors so that the defense might more fully explore with each of the jurors certain matters which had come up in the *voir dire*. For example, the four admitted that they knew various members of the decedent's family. One of them admitted that she had talked with various persons, including policemen, with reference to the case. Another admitted having discussed the case at his place of work. Two others admitted that they had heard general talk about the case. Rather than permitting counsel to pursue questions out of the presence of other jurors so that all these matters might be more particularly probed, the court addressed a general inquiry to the entire panel asking in substance whether there was anyone who felt that he could not, without regard to any circumstance or anything which he may have heard, try the case entirely on the evidence and the instructions of the court and render a fair and impartial verdict. That procedure, although unobjectionable, may not have been as desirable as allowing a procedure which would have permitted possible matters of bias or prejudice to be more fully explored so that there could have been no question of lack of qualification on the part of any juror and so that peremptory challenges might have been more intelligently made.

The principles which we have set forth hereinabove are consistent with the prior expressions of this Court in *West Virginia Human Rights Commission v. Ten Pin Lounge, Inc.*, ＿＿＿ W. Va. ＿＿＿, 211 S.E.2d 349 (1975); *Thornsbury v. Thornsbury*, 147 W. Va. 771, 131 S.E.2d 713 (1963); *State v. Stonestreet*, 112 W. Va. 668, 166 S.E. 378 (1932); and *State v. Toney*, 98 W. Va. 236, 127 S.E. 35 (1925).

## III. *INSTRUCTIONS*

The defendant assigns as error the giving of State's Instructions E, F, G, H and I and the failure of the trial court to give Defendant's Instruction No. 18.

The text of the questioned instructions are as follows:

*"STATE'S INSTRUCTION NO. E:*

"The Court instructs the jury that the law is that a man is taken to intend that which he does, or which is the natural and necessary consequences of his own act; and, therefore, if they believe from the evidence that Parker Lee Pendry shot and killed the deceased, Cecil Hagerman, by the deliberate use of an instrument likely to produce death, under the circumstances, then the presumption of the law, arising in absence of proof to the contrary, is that he intended the consequences that resulted from said use of said deadly instrument."

*"STATE'S INSTRUCTION NO. F:*

"The Court instructs the jury that although you may believe from the evidence that Parker Lee Pendry was laboring under partial insanity at the time Cecil Hagerman was killed, if he still understood the nature and character of his act and its consequences, and had knowledge that it was wrong and criminal to shoot Cecil Hagerman, if you believe beyond a reasonable doubt that he did shoot Cecil Hagerman, and if Parker Lee Pendry was capable of knowing at the time that if he did shoot Cecil Hagerman he would do wrong and receive punishment, then any partial insanity that Parker Lee Pendry may have been laboring under at the time is not sufficient to exempt him from responsibility to the law for his crime of killing Cecil Hagerman."

*"STATE'S INSTRUCTION NO. G:*

"If you believe from the evidence in this case beyond a reasonable doubt that the defendant, Parker Lee Pendry, wilfully, maliciously, deliberately and unlawfully shot and killed Cecil Hagerman, and that at the time of such act the defendant, Parker Lee Pendry, knew right from wrong and understood the nature and consequences of his action, you should find the defendant, Parker

Lee Pendry, guilty as charged in the indictment in this case."

*"STATE'S INSTRUCTION NO. H:*

"The Court instructs the jury that if you believe from the evidence in this case, beyond a reasonable doubt, that Parker Lee Pendry wilfully, deliberately and maliciously shot and killed Cecil Hagerman, but at the time of so doing the said Parker Lee Pendry knew the difference between right and wrong and knew the consequences of his act, you may find him guilty as charged in the indictment, although you may further find that the said Parker Lee Pendry at the time he so shot and killed Cecil Hagerman was acting under an irresistable and uncontrollable impulse so to do."

*"STATE'S INSTRUCTION NO. I:*

"The Court instructs the jury that if the defendant, Parker Lee Pendry, relies upon insanity as a defense to the crime charged against him in the indictment in this case, he must prove such insanity to the satisfaction of the jury in order to entitle him to an acquittal on that ground, and that the said Parker Lee Pendry cannot rely simply on having raised a reasonable doubt in the minds of the jury as to whether or not he was insane at the time he committed that act charged to him by the indictment in this case, if you believe beyond a reasonable doubt from all the evidence in this case that the defendant, Parker Lee Pendry, is guilty as charged in the indictment in this case."

*"DEFENDANT'S INSTRUCTION NO. 18:*

"The Court instructs the jury that if you believe from the evidence that Parker Lee Pendry was an insane man at the time of the homicide in question, that is, he did not possess reason enough to know right from wrong, or if he knew, did not have the power to control or restrain his actions, you will find the defendant not guilty by reason of insanity."

A proper consideration of the issues presented by the court's giving or refusing of these instructions requires that we consider each of them in detail.

Before any detailed discussion of instructions is undertaken, it should be noted that the trial in this case was concluded before this Court's opinions in *State v. Grimm,* W. Va., 195 S.E.2d 637 (1973), and *State v. Myers, supra,* both of which provided that instructions in this State on the issue of insanity should generally be couched in the language of the Model Penal Code which provides that when a defendant in a criminal case raises the issue of insanity, the test of his responsibility for his act is whether at the time of the commission of the act it was the result of a mental disease or defect causing the accused to lack substantial capacity either to appreciate the wrongfulness of his act or to conform his act to the requirements of the law.

State's Instructions F, G and H did not impose this test and at the time of the trial of the instant case were not required to impose this test. However, upon a retrial in this case the court should follow the test prescribed in *State v. Grimm, supra,* and *State v. Myers, supra.*

While we do not attempt to voice the exact language of any instruction on the issue of insanity, we do intend to "embrace today's advances," and if the language is to be varied in the future, it should be varied in terms of appearing more appropriate when and if "more rational solutions have been uncovered," *United States v. Chandler,* 393 F.2d 920, 927 (4th Cir. 1968), rather than insisting upon language which adheres to or endeavors to return to the now outmoded M'Naghten Rule.

### A. *THE IMPACT OF MULLANEY v. WILBUR, 421 U.S. 684, 44 L.Ed.2d 508 (1975)*

It is impossible to consider instructions to which Pendry objected in this case without considering *Mullaney.* The Supreme Court of the United States enunciated therein constitutional doctrine which cannot be ignored.

Without reference to the tortuous procedural course of the case prior to its final decision by the Supreme Court of the United States, *Mullaney* presented the question of the validity of a statute of the State of Maine which required a defendant charged with murder, which upon conviction carried a mandatory sentence of life imprisonment, to prove that he acted in the heat of passion, on sudden provocation, without express or implied malice aforethought, in order to reduce the homicide to manslaughter, in which case it was provided that the punishment would be a fine or imprisonment not exceeding twenty years.

The court defined its task as that of deciding whether such a rule comported with the due process requirement, clearly established in *In Re Winship*, 397 U.S. 358, 364, 25 L.Ed.2d 368, 90 S.Ct. 1068 (1970), that the prosecution prove beyond a reasonable doubt every fact necessary to constitute the crime charged. The Supreme Court's specific holding on the issue was " . . . that the Due Process Clause requires the prosecution to prove beyond a reasonable doubt the absence of heat of passion on sudden provocation when the issue is properly presented in a homicide case." 421 U.S. at 686, 44 L.Ed.2d at 522.

The Supreme Court found that the Maine statute was constitutionally defective in that it affirmatively shifted the burden of proof to the defendant. In answer to the argument that to require the State to prove the absence of heat of passion beyond a reasonable doubt would impose upon the State a requirement of proving a negative, the Supreme Court of the United States found that such a requirement was not unique in our system of criminal jurisprudence and imposed " . . . no unique hardship on the prosecution that would justify requiring this defendant to carry the burden of proving a fact so critical to criminal culpability." 421 U.S. at 686, 44 L.Ed.2d at 522.

A review of many court decisions[3] and much legal scholarship[4] indicates little agreement and considerable

uncertainty regarding the full consequences of the decision in *Mullaney*.

The precise bearing which *Mullaney* may have in a criminal case upon statutes or instructions which deal with defenses which may be available to a defendant or presumptions which may be indulged in has, by their admission, eluded all who have attempted to grapple with the constitutional concept pronounced.

We freely admit that we cannot, in this case, undertake to discern the full impact of *Mullaney* upon all statutes, instructions and presumptions previously accepted as accurate statements of the law governing criminal cases in this State.

We are content to say that *Mullaney* stands for the following general propositions: (1) In a criminal case, the State is required to carry the burden of proving beyond a reasonable doubt every material element of the crime with which the defendant is charged; (2) In carrying its burden of proof beyond a reasonable doubt, the State is not entitled to an instruction which requires a jury to accept as proved beyond a reasonable doubt any element of the criminal offense charged, and this concept embraces presumptions (more properly inferences) as to which the jury may be instructed; and (3) A defendant in a criminal case cannot be required to present evidence either in terms of going forward with the evidence

---

[3]*See, e.g., People v. Tewksbury*, 15 Cal. 3d 953, 544 P.2d 1335, 127 Cal. Rptr. 135 (1976); *Grace v. Hopper*, 234 Ga. 669, 217 S.E.2d 267 (1975); *State v. Monroe*, ____ Iowa ____, 236 N.W.2d 24 (1975); *State v. Inman*, ____ Me. ____, 350 A.2d 582 (1976); *Evans v. State*, 28 Md. App. 640, 349 A.2d 300 (1975); *People v. Leyva*, 38 N.Y.2d 160, 341 N.E.2d 546, 379 N.Y.S.2d 30 (1975); and *State v. Williams*, 288 N.C. 680, 220 S.E.2d 558 (1975).

[4]*See, e.g.,* Tushnet, *Constitutional Requirements of Mens Rea*, 55 Boston U. L. Rev. 775 (1975); *Comment, Affirmative Defenses in Ohio After Mullaney v. Wilbur*, 36 Ohio St. L.J. 828 (1975); *Comment, Constitutionality of Affirmative Defenses in the Texas Penal Code*, 28 Baylor L. Rev. 120 (1976); and 4 Hofstra L. Rev. 493 (1976).

or in terms of bearing the burden of persuasion in connection with any material element of the crime charged.

In West Virginia it has always been accepted that the State bears the ultimate burden of proving beyond a reasonable doubt every material fact necessary to the conviction of the defendant of the crime with which he is charged. Thus, *Mullaney* results in no change in our criminal law, evidence or procedure with reference to that concept.

As to the defense of insanity, it is the clearly established rule in this State that the defendant is required to establish his insanity by a preponderance of the evidence. *State v. Myers, supra; State v. McCauley,* 130 W. Va. 401, 43 S.E.2d 454 (1947); and *State v. Cook,* 69 W. Va. 717, 72 S.E. 1025 (1911). *Mullaney* in no way requires any departure in this State from that well-defined and clearly established rule. The separate opinion of Mr. Justice Rehnquist in *Mullaney,* joined in by The Chief Justice, made it clear that there is no inconsistency between requiring the State to prove every element which constitutes the crime beyond a reasonable doubt and the imposition upon the defendant of the burden of proving insanity. The Supreme Court's prior holding on this issue in *Leland v. Oregon,* 343 U.S. 790, 96 L.Ed. 1302, 72 S.Ct. 1002 (1952), was specifically referred to and it was pointed out that the Court found no constitutional impediment to a requirement that a defendant be required to prove his insanity beyond a reasonable doubt. We have not imposed any such requirement upon a defendant in this State. We only require that he prove insanity by a preponderance of the evidence. Our theory is consistent with the eloquent dissent in *Leland v. Oregon, supra,* written by Mr. Justice Frankfurter, who was joined therein by Mr. Justice Black. In his dissenting opinion, Mr. Justice Frankfurter, although disapproving of a requirement that a defendant be required to prove insanity beyond a reasonable doubt, commented further, at 343 U.S. 804, as follows:

"This does not preclude States from utilizing common sense regarding mental irresponsibility for acts resulting in homicide—from taking for granted that most men are sane and responsible for their acts. That a man's act is not his, because he is devoid of that mental state which begets culpability, is so exceptional a situation that the law has a right to devise an exceptional procedure regarding it. Accordingly, States may provide various ways for dealing with this exceptional situation by requiring, for instance, that the defense of 'insanity' be specially pleaded, or that he on whose behalf the claim of insanity is made should have the burden of showing enough to overcome the assumption and presumption that normally a man knows what he is about and is therefore responsible for what he does . . . ."

Both *Mullaney* and *Leland* indicate that the so-called insanity defense is one which is considered only after the State has presented evidence from which the jury could find all elements of the offense, including *mens rea* if required, as proved beyond a reasonable doubt.

Other common defenses in West Virginia are likewise in our judgment free from constitutional infirmity under *Mullaney*. For example, the alibi defense as used in this State does not relieve the prosecution of proving beyond a reasonable doubt the actual presence of the accused at the time and place of the commission of the crime when personal presence is essential thereto. *State v. Peterson,* 132 W. Va. 99, 51 S.E.2d 78 (1948); *State v. Aliff,* 122 W. Va. 16, 7 S.E.2d 27 (1940); *State v. Friend,* 100 W. Va. 180, 130 S.E. 102 (1925); *State v. Winans,* 100 W. Va. 418, 130 S.E. 607 (1925); *State v. Counts,* 90 W. Va. 338, 110 S.E. 812 (1922); *State v. Parsons,* 90 W. Va. 307, 110 S.E. 698 (1922); and *State v. Lowry,* 42 W. Va. 205, 24 S.E. 561 (1896). Similarly, the defense of self-defense, although required to be proved by a preponderance of the evidence, *State v. Zannino,* 129 W. Va. 775, 41 S.E.2d 641 (1947); *State v. Coontz,* 94 W. Va. 59, 117 S.E. 701 (1923); *State v. Hatfield,* 48 W. Va. 561, 37 S.E. 626 (1900); *State*

*v. Greer,* 22 W. Va. 800 (1883); and *State v. Cain,* 20 W. Va. 679 (1882), does not relieve the State from the obligation to prove every material element of the crime beyond a reasonable doubt.

These and other defenses are not invalidated by *Mullaney* so long as the State is not relieved of the ultimate burden of proving beyond a reasonable doubt every material element of the crime. If a defendant is not put in the position of being required to rebut the State's case by the introduction of evidence, he cannot claim any constitutional infirmity. When, however, he elects to take advantage of any authorized defense under the law of this State, he may be required to carry a burden of going forward with the evidence and carrying a burden of persuasion to a degree not greater than by a preponderance of the evidence. The State is entitled to define the burden which he must carry if his particular defense is to be sustained, provided that this does not lessen the burden of the State to prove every material element of the crime beyond a reasonable doubt.

*Mullaney* does have a considerable impact on the utilization of presumptions in criminal cases and has application to the case here on appeal in that connection.

The entire law of presumptions has been characterized as a semanticist's nightmare. Indeed, the scholars on the subject have been unable to arrive at any generally accepted rule regarding what a presumption really is and what the different types of presumptions really are. There is no highway by which any of us can safely walk through "conclusive presumptions", "permissive presumptions" and "mandatory presumptions." As Justice Neely said in *Roe v. M & R Pipeliners, Inc.,* W. Va., 202 S.E.2d 816, 820 (1973):

> "Few areas of the law are as confusing or as hotly debated as the law of presumptions. As one text writer put it, 'Every writer of sufficient intelligence to appreciate the difficulties of the subject matter has approached the topic of presumptions with the sense of hopelessness and

has left it with a feeling of despair.' Morgan, 'Presumptions' 12 Wash. L.Rev.225 (1937)."

Because of the confusion in the entire law of presumptions, particularly in their applicability to procedural and evidentiary problems in the field of criminal law, it may be better to utilize "inferences" instead of "presumptions" and to provide that the jury may be permitted to infer a fact from a fact established beyond a reasonable doubt. However, the jury cannot be instructed that it either must accept the inference or that it may accept the inference unless rebutted by evidence introduced by the defendant. The jury must be free to reject any "presumption" or "inference" unless it believes it is established from all the evidence beyond a reasonable doubt. Such a rule imposes no obligation on a defendant to introduce any proof, and is not, therefore, constitutionally defective.

The Supreme Court of the United States itself has had difficulty with the entire matter of presumptions, particularly presumptions which have been imposed by statute. For example, tests which the United States Supreme Court has used when the constitutionality of presumptions under the due process clause has been challenged is the "rational connection" test, *see, Mobil, J. & K.C.R.R. v. Turnipseed,* 219 U.S. 35, 55 L.Ed. 78, (1910), or the "comparative convenience" test, *see, Morrison v. California,* 291 U.S. 82, 78 L.Ed. 664, (1934), which would seem to be a test used in connection with the "rational connection" test, *see, Tot v. United States,* 319 U.S. 463, 87 L.Ed. 1519, (1943); or "the greater includes the lesser" test, *see, Ferry v. Ramsey,* 277 U.S. 88, 72 L.Ed. 796, (1928). These tests have not proved particularly satisfactory or clear. *See e.g., Note, Constitutionality of Rebuttable Statutory Presumptions,* 55 Colum. L. Rev. 527 (1955). They have certainly not defined the scope of constitutionally permissible presumptions.

Most of these difficulties which have emerged from the confusion of the law on presumptions would be overcome if we first fully appreciated Mr. Justice Frankfurter's observation that the law does not preclude States from utilizing common sense, and then firmly adhered to the propositions that, in a criminal case, a defendant is presumed to be innocent, that such presumption can be overcome only by proof of all material facts beyond a reasonable doubt, and that even inferences of material facts, before they can be accepted by a jury, must be established in the minds of the jury beyond a reasonable doubt.

## B. *ERRONEOUS INSTRUCTIONS IN THE LIGHT OF MULLANEY AND TRADITIONAL WEST VIRGINIA LAW*

As to State's Instructions Nos. G and H which purport to instruct the jury as to the defense of insanity, we do not find them objectionable as of the time of the trial of Pendry in the instant case. However, upon a retrial of this case, we would find such instructions objectionable in that they do not comply with an approach based on the Model Penal Code as outlined in *State v. Grimm, supra,* and as approved in *State v. Myers, supra.*

With reference to State's Instruction No. I, we find that it fails to instruct properly as to the burden of proof which is carried by the defendant—his burden being only to prove his defense of insanity by a preponderance of the evidence, and we further find, as in *State v. Myers, supra,* that the instruction tends to be confusing. It diverts the jury's attention from the true measure of proof which the law requires and purports to define defendant's burden of proof in terms of his inability to rely on raising a reasonable doubt in the minds of the jury as to whether or not he was insane at the time he committed the act charged to him by the indictment in the case.

We are more concerned, however, with State's Instructions Nos. E and F.

State's Instruction No. F does not relate to evidence which was received in the case. The record shows that the evidence did not have to do with "any partial insanity" on the part of the defendant Pendry. Consequently, this instruction tends to lead the jury into a consideration of matters which were not properly before it in the evidence that was adduced at trial, and is, therefore, one which constitutes prejudicial error. *See, State v. Bennett,* W. Va., 203 S.E.2d 699 (1974); and *State v. Collins,* 154 W. Va. 771, 180 S.E.2d 54 (1971).

State's Instruction No. E constitutes prejudicial error in this case for the reason that it does not properly state the law of this State regarding the inference which may arise from the deliberate use of a deadly weapon. This instruction, as customarily given, was required to embody the fact that the presumption would arise from the deliberate use of a deadly weapon only when the jury believed beyond a reasonable doubt that it was used without any or upon very slight provocation. *See, State v. Douglass,* 28 W. Va. 297 (1886); and *State v. Cain, supra.* The instruction is further deficient under *Mullaney* in that it instructs the jury that there is a presumption of law which attaches to the deliberate use of a deadly weapon, namely, that the defendant intended the consequence that resulted from the use thereof which arises in the absence of proof to the contrary. This instruction told the jury that, when the State has introduced evidence showing Pendry's deliberate use of a deadly weapon, he was presumed to have intended the consequence in the absence of proof to the contrary. This would entitle the jury to accept proof of the use of the deadly weapon as being proof beyond a reasonable doubt of the elements of intent and malice unless there was proof to the contrary. A presumption cannot relieve the State of proving those elements beyond a reasonable doubt. Further, this instruction seems to require Pendry to carry the burden of proving that he did not intend the consequences that resulted from using the deadly weapon. The instruction is therefore defective under traditional West Virginia principles of law and under the *Mullaney*

doctrine, and if there were no other errors in the case, this instruction alone would require reversal.

There is no merit in defendant's contention that the court erred in refusing to give his Instruction No. 18 with reference to insanity. The test which that instruction imposed did not accurately state the law at the time of the trial and does not accurately state the law established in *State v. Grimm, supra,* and *State v. Myers, supra.* Consequently, it was not appropriate at the time of Pendry's trial and would not be appropriate at a retrial of this case.

There are other instructions which were given at Pendry's trial which were not questioned on appeal and do not form the basis for reversal. However, in view of the *Mullaney* decision it seems clear to us that they would be improper if given at a retrial of this case.

State's Instructions Nos. B and D are constitutionally defective under the *Mullaney* rule in that both instructions place upon the defendant not only the burden of introducing evidence but also impose upon him a burden of persuasion. For example, State's Instruction No. B requires the defendant to introduce evidence to rebut the presumption of malice which the instruction states is presumed from the fact of killing. Although malice may be inferred from the fact of killing, the defendant cannot have the burden cast upon him to introduce evidence to rebut that presumption. Further, although malice may be inferred from the fact of killing, the jury is not required to accept it as proved beyond a reasonable doubt merely because of an inference. The jury must find that malice has been proved by the State beyond a reasonable doubt in the light of all the evidence in the case.

State's Instruction No. D tells the jury that all murders are presumed in law to be murder in the second degree and that, in order to elevate the offense to murder in the first degree, the burden of proof is on the State, but that, in order to reduce the offense below

murder in the second degree, the burden is on the defendant. This is an instruction which has been given and accepted many times as being a correct statement of the law of West Virginia. Under the doctrine of *Mullaney* this instruction would not be a correct statement of the law if given at a retrial of this case and would not be approved by this Court on appeal.

It is our view that the doctrine of *Mullaney*, insofar as it affects the burden of proof which is carried by a defendant and insofar as it affects the utilization of "presumptions" (more properly "inferences") in instructions, should be applied to all criminal cases now in the trial or appellate process and should not otherwise be retroactive.

For the reasons stated in this opinion, the judgment of the then Intermediate Court of McDowell County is reversed and the verdict of the jury is set aside and a new trial is awarded to the defendant, Parker Lee Pendry.

*Reversed, remanded, new trial awarded.*